Richard NICHOLAS; Lynn Nicholas; Robert M. Blackburn; and Cheryl S. Blackburn, on behalf of themselves and on behalf of the class of all others similarly situated, Appellants,

v.

SAUL STONE & COMPANY LLC, f/k/a Saul Stone and Company; First Options of Chicago, Inc., dba LIT Division of First Options; Smith Barney Inc; LFG, LLC, f/k/a Linnco Futures Group, Inc.; GNI Incorporated; Dean Witter Reynolds, Inc.; ING (U.S.) Securities Futures & Options, Inc. dba ING Futures & Options; Merrill, Lynch, Pierce, Fenner & Smith, Inc.; Prudential Securities, Inc.; Rosenthal Collins Group, L.P. f/k/a Rosenthal & Company; E.D. & F. Man International Inc., f/k/a E.D. & F. Man International Securities, Inc.; Clarence Delbridge, III; Thomas H. Stone; National Futures Association; John Doe; Joan Doe; Jack Doe; Joseph Doe; Jane Doe; Jake Doe; Jeff Doe; Jean Doe; James Doe; Jill Doe and Joel Doe; GNI Limited.

No. 98–5390.

United States Court of Appeals, Third Circuit.

Argued July 15, 1999.

Filed Aug. 7, 2000.

Edward M. Bernstein (argued), Lawrenceville, NJ, Attorney for Appellants.

Stephen P. Bedell, Timothy G. McDermott (argued), Gardner, Carton & Douglas, Chicago, IL, Attorneys for Appellees Saul Stone & Company LLC, First Options of Chicago, Inc. LFG, LLC and ING (U.S.) Securities, Futures Options, Inc., Clarence Delbridge, III, and Thomas H. Stone.

E. Michael Bradley, Jones, Day, Reavis & Pogue, New York, NY, Attorney for Appellee Smith Barney, Inc.

David J. Libowsky (argued), Bressler, Amery & Ross, Morristown, NJ, Attorney for Merrill, Lynch, Pierce, Fenner & Smith, Inc.

Warren H. Colodner, Kirkpatrick & Lockhart, New York, NY, Attorney for Appellee Prudential Securities, Inc.

J. Todd Raymond, Manalapan, NJ, Attorney for Appellee Rosenthal Collins Group, L.P.

Alan I. Dunst, Hoagland, Longo, Moran, Dunst & Doukas, New Brunswick, NJ, Attorney for E.D. & F. Man International Securities, Inc.

Lowell E. Sachnoff, Brian D. Roche (argued), Sachnoff & Weaver, Chicago, IL, Attorneys for National Futures Association.

Before: ROTH and RENDELL, Circuit Judges and POLLAK,* District Judge.

## OPINION OF THE COURT

POLLAK, District Judge.

Appellants seek review of a judgment of the District Court of New Jersey granting defendants' motion to dismiss plaintiffs' amended complaint. The District Court dismissed the complaint for lack of personal jurisdiction over the two individual defendants, and for failure to state any claims upon which relief could be granted against the other defendants. We conclude that it was proper for the District Court to grant the motion to dismiss, and hence we will affirm.

### I.  Facts

We begin by summarizing the principal facts alleged in the amended complaint—facts to be taken as true for the purpose of testing the legal sufficiency of plaintiffs' claims. According to the amended complaint, the plaintiffs (suing both on their own behalf and also, putatively, as representatives of others similarly situated[1])

---

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. The District Court dismissed the amended complaint prior to consideration of the appropriateness of class certification. In this court, therefore, the parties are limited to the named

are persons who, between 1989 and 1995, were lured into improvident investments in the commodities market by Chuck ("Chuckles") Kohli, Nungambukkam Swamy Ramchandran,[2] and certain corporate pawns of Kohli and Ramchandran known collectively as "Sigma."[3] Plaintiffs alleged that Kohli, Ramchandran, and Sigma held themselves out as successful managers of various commodity pools and thus were able to raise between forty-one and sixty-eight million dollars. The investors were told that the funds would be placed in a commodities trading pool[4] and used to invest in commodities futures and options. Plaintiffs and other investors signed powers of attorney giving Kohli, Ramchandran, and Sigma discretionary authority over investing and trading decisions with respect to their investments. Plaintiffs further alleged that, although Kohli and Ramchandran did, in fact, invest the solicited funds through a variety of futures commodities merchants ("FCMs"), the bulk of those investments failed. However, in the initial phases of the allegedly fraudulent scheme, investors seeking to withdraw their funds or profits were paid with the funds of later investors, thus creating the aura of success. The plaintiffs' pleadings characterized this structure as a Ponzi scheme.[5]

Kohli has since pled guilty to federal criminal charges stemming out of these events, and Ramchandran has since filed for bankruptcy. As a result, plaintiffs have undertaken to seek recoupment of their losses elsewhere. Plaintiffs brought suit in the District Court for New Jersey against the FCMs used by Kohli, Ramchandran, and Sigma, as well as the National Futures Association ("NFA")—the futures industry's designated self-regulatory organization[6]—and two of the NFA's officers.

Because of the various registration requirements (detailed below) laid down by the Commodities Exchange Act ("CEA"), 7 U.S.C. § 1a, *et seq.*, and state securities law, Kohli, Ramchandran, and Sigma were, so plaintiffs alleged, under a duty to register with the Commodities Futures

---

plaintiffs and defendants, and the issue of class certification is not before us.

**2.** The record is not entirely consistent with respect to the spelling of Mr. Ramchandran's name, as is discussed, *infra*, at note 15.

**3.** The "Sigma" enterprises were: Sigma, Inc., Geronimo, Inc., Vol Partners, L.P., and Savid Group.

**4.** The Ninth Circuit, speaking through Judge Nelson, has pointed out that "[w]hile numerous courts have dealt with the concept of commodity pools in the abstract, few have specifically attempted to define what constitutes a pool." *Lopez v. Dean Witter Reynolds, Inc.*, 805 F.2d 880, 883 (9th Cir.1986). Using as its models the few relatively precise judicial descriptions of the operations of commodities pools, the Ninth Circuit drew the following profile of a pool: "(1) an investment organization in which the funds of various investors are solicited and combined into a single account for the purpose of investing in commodity futures contracts; (2) common funds used to execute transactions on behalf of the entire account; (3) participants share pro rata in accrued profits or losses from the commodity futures trading; and (4) the trans-

actions are traded by a commodity pool operator in the name of the pool rather than in the name of any individual investor." *Id.*

**5.** "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due." *United States v. Masten*, 170 F.3d 790, 797 n. 9 (7th Cir.1999) (quotations and citations omitted).

**6.** The NFA is a Registered Futures Association which, pursuant to the Commodities Exchange Act § 17, 7 U.S.C. § 21, functions as the futures industry's self-regulatory organization. It performs screening to determine fitness to become and remain a member of the NFA, establishes and enforces certain rules and standards, audits and investigates members, and conducts arbitration in futures disputes. In order to engage in the business of buying or selling futures contracts for the public, one generally must be a member of the NFA.

Trading Commission (the "CFTC"), the Securities and Exchange Commission, and the New Jersey Bureau of Securities; they were also, plaintiffs alleged, obligated to become members of the NFA. Plaintiffs further alleged that Kohli, Ramchandran, and Sigma, in fact, did not register with the several regulatory agencies, or become members of the NFA, and hence that the various FCMs that accepted their business acted improperly. In particular, plaintiffs alleged that the defendant FCMs and their employees failed to inquire into the source of funds in the Sigma accounts or into the CFTC registration status and NFA membership of Kohli, Ramchandran, and Sigma. Plaintiffs contended that had the defendants made such an investigation, they would have discovered that Kohli, Ramchandran, and Sigma were trading in violation both of the registration requirements of the CEA—which mandate that any person associated with a commodity pool operator be registered with the CFTC[7]—and of the membership requirements of the NFA.[8] Plaintiffs alleged that the FCMs and their employees, by failing to make the necessary investigation, directly violated the CEA, and aided and abetted violations of the CEA;[9] breached certain contracts with the NFA of which appellants were third-party beneficiaries; violated New Jersey's Uniform Securities Law, N.J.S.A. 49:3–47, *et seq.*; breached fiduciary duties owed to appellants; acted

negligently; violated provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961, *et seq.*; committed fraud; engaged in civil conspiracy; and, lastly, violated New Jersey's Consumer Fraud Act, N.J.S.A. 56:8–1, *et seq.* Thus, of the nine claims asserted against the defendant FCMs, all but three—namely the alleged violations of the CEA (both direct and aiding-and-abetting) and of RICO—sound in state law.

In addition to alleging that the defendant FCMs failed to conduct inquiries into the source of the funds of Kohli, Ramchandran, and Sigma, plaintiffs claimed that the NFA, as well as two of its officers—individual defendants Thomas Stone and Clarence Delbridge III—were instrumental in enabling Kohli, Ramchandran, and Sigma to operate the alleged Ponzi scheme. As noted above, the NFA is the futures industry's self-regulatory organization. Persons and corporations trading in commodities futures and options are, for practical purposes, required to be members of the NFA, as NFA by-laws preclude members from handling transactions for persons who are required to be registered with the CFTC but are not members of the NFA.[10] Plaintiffs alleged that the NFA, and Stone and Delbridge, acting in bad faith, failed to enforce the rules and by-laws of the NFA prohibiting the FCMs from trading with Kohli, Ramchandran, and Sigma. This bad faith failure, so

---

7. The CEA provides that: "[i]t shall be unlawful for any person to be associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an associated person of such commodity pool operator and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked." 7 U.S.C. § 6k(2).

8. *E.g.,* NFA By-law 1101 provides that "[n]o Member may carry an account or accept an

order or handle a transaction in commodities futures contracts for or on behalf of any non-Member of the NFA, or suspended Member, that is required to be registered with the [CFTC] as an FCM, Introducing Broker, Commodity Pool Operator, Commodity Trading Advisor, or Leveraged Transaction Merchant, and that is acting in respect to an account, order or transaction for a customer, a commodity pool or participant therein, a client of a commodity trading advisor, or other person."

9. Subsection 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1), is discussed *infra,* at note 12 and accompanying text.

10. *See supra* note 8.

plaintiffs contended, made Stone, Delbridge, and the NFA civilly liable under subsection 22(b)(2) of the CEA, 7 U.S.C. § 25(b)(2).[11] This is the sole federal claim asserted against defendants Stone and Delbridge and the NFA.

Plaintiffs further contended that the NFA by-laws and rules prohibiting the FCMs from trading with Kohli, Ramchandran, and Sigma created contractual obligations, and that plaintiffs, as third-party beneficiaries of those contracts, were entitled, under New Jersey law, to sue the NFA, Stone, and Delbridge. Finally, plaintiffs asserted that the NFA, as well as its officers Stone and Delbridge, had, pursuant to New Jersey law, a fiduciary obligation to plaintiffs, as potential investors, to ensure that the FCMs did not trade with non-members, and that the failure to do so constituted a breach of that fiduciary duty.

Upon defendants' motion to dismiss the complaint, the District Court found that it lacked personal jurisdiction over defendants Stone and Delbridge and that, as to the other defendants, the amended complaint failed to state any claims—whether arising under federal law or state law—upon which relief could be granted. Ac-cordingly, the District Court granted defendants' motion. *See Nicholas v. Stone,* No. 97-860 slip op. at 52 (D.N.J. June 30, 1998).

On appeal, plaintiffs—appellants in this court—argue that the District Court had valid *in personam* jurisdiction over defendants Stone and Delbridge, and that the amended complaint does state claims upon which relief could be granted.

## II. Discussion

Appellants have raised numerous issues. Most do not, in our view, require discussion in this opinion because they have been fully and correctly canvassed in the District Court's comprehensive opinion. There are, however, a few issues arising under section 22 of the CEA, 7 U.S.C.§ 25, which, we think, call for additional analysis. We agree with the District Court's disposition of those issues, but, as will be seen, as to certain aspects of those issues we proceed by a somewhat different route.

### A. In personam *jurisdiction*

The District Court commenced its legal discussion by examining whether it had *in personam* jurisdiction over the two individual defendants, Stone and Delbridge, both

---

**11.** Subsection 22(b)(2) of the CEA provides, in pertinent part:

(2) A registered futures association that fails to enforce any bylaw or rule that is required under section 21 of this title or in enforcing any such bylaw or rule violates this chapter or any Commission rule, regulation, or order shall be liable for actual damages sustained by a person that engaged in any transaction specified in subsection (a) of this section to the extent of such person's actual losses that resulted from such transaction and were caused by such failure to enforce or enforcement of such bylaw or rule.

(3) Any individual who, in the capacity as an officer, director, governor, committee member, or employee of a contract market, clearing organization, licensed board of trade, or a registered futures association willfully aids, abets, counsels, induces, or procures any failure by any such entity to enforce (or any violation of the chapter in enforcing) any bylaw, rule, regulation, or resolution referred to in paragraph (1) or (2) of this subsection, shall be liable for actual damages sustained by a person who engaged in any transaction specified in subsection (a) of this section on, or subject to the rules of, such contract market, licensed board of trade or, in the case of an officer, director, governor, committee member, or employee of a registered futures association, any transaction specified in subsection (a) of this section, in either case to the extent of such person's actual losses that resulted from such transaction and were caused by such failure or violation.

(4) A person seeking to enforce liability under this section must establish that the contract market, licensed board of trade, clearing organization, registered futures association, officer, director, governor, committee member, or employee acted in bad faith in failing to take action or in taking such action as was taken, and that such failure or action caused the loss.

7 U.S.C. § 25(b)(2).

of whom were domiciled and employed in Illinois. It will be recalled that Stone and Delbridge were (together with the NFA) sued on state law claims of breach of contract and breach of fiduciary duty and also, pursuant to subsection 22(b)(2) of the CEA, 7 U.S.C. § 25(b)(2), on a federal law claim of bad faith failure to enforce NFA rules and by-laws.

■ The District Court began its analysis by considering whether, as a court sitting in New Jersey, it had jurisdiction over Stone and Delbridge pursuant to New Jersey's long-arm statute which, as the District Court put it, "allows a [New Jersey state] court to exercise personal jurisdiction over non-resident defendants to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." First, the District Court observed that "jurisdiction over the defendants does not exist simply because they are agents or employees of organizations which presumably are amenable to jurisdiction in this Court." To establish this point, the District Court aptly cited *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). In *Keeton*, the Supreme Court noted that "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him.... Each defendant's contacts with the forum state must be assessed individually." *Id.* at 781 n. 13, 104 S.Ct. 1473. Accordingly, the District Court then "assessed individually" the contacts of Stone and Delbridge with New Jersey:

> In the instant case, plaintiffs have not alleged any contact defendants Delbridge and Stone had with the forum New Jersey. Defendants Delbridge and Stone did not reside in New Jersey, did not visit here, did not own property here or even have any personal contact with the forum state. This Court cannot, therefore,find that defendants have systematic and continuous contacts with New Jersey. Further, defendants Del-

bridge and Stone never communicated with plaintiffs in New Jersey and never spoke or corresponded with anyone purporting to represent the Sigma entities. Therefore, this court cannot find that defendants Delbridge and Stone took any action by which they purposefully availed themselves of the privilege of conducting activities within the forum state or that would justify haling them into Court in this state. Considering this lack of any allegation that defendants had the requisite minimum contacts in their individual capacities, this Court cannot find that either specific or general jurisdiction exists over them.

The District Court's findings, amply supported by the record, establish that Stone and Delbridge could not, consistently with Fourteenth Amendment due process standards, be subjected to the *in personam* jurisdiction of the District Court with respect to a state law claim. It remains to consider whether the District Court was correct in concluding that Stone and Delbridge were also not amenable to *in personam* jurisdiction with respect to the federal claim appellants asserted against Stone, Delbridge and the NFA pursuant to subsection 22(b)(2) of the CEA, 7 U.S.C. § 25(b)(2).

■ Appellants contended in the District Court, and repeat the contention here, that Congress has authorized nationwide jurisdiction for suits arising under section 22. In support of this contention appellants have relied on subsection 22(c) of the CEA, 7 U.S.C. § 25(c). Subsection 22(c) provides as follows:

(c) **Jurisdiction; statute of limitations; venue; process**

The United States district courts shall have exclusive jurisdiction of actions brought under this section. Any such action shall be brought not later than two years after the date the cause of action arises. Any action brought under subsection (a) of this section may be brought in any judicial district wherein the defendant is found, resides, or trans-

acts business, or in the judicial district wherein any act or transaction constituting the violation occurs. Process in such action may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant may be found.

Appellants have argued that Stone and Delbridge are subject to the *in personam* jurisdiction of a federal district court sitting in New Jersey because the third sentence of the quoted subsection expressly provides that an "action . . . may be brought . . . in the judicial district wherein any act or transaction constituting the violation occurs." The District Court rejected the argument: "the above-stated provision is a venue provision, not a jurisdictional one, and as such, does not provide this Court with personal jurisdiction over the individual defendants." We think the District Court was right in construing the third sentence of subsection (c) as directed to venue rather than to *in personam* jurisdiction.

There is a further reason why the third sentence of subsection (c) is of no assistance to appellants. The sentence, by its own terms, addresses actions "brought under subsection (a) of this section [section 22]." Appellants' claim against Stone, Delbridge and the NFA was brought under subsection (b) of section 22.

Finally, appellants invoke the fourth sentence—the concluding sentence—of subsection (c), which provides that "[p]rocess in such action may be served in any judicial district of which the defendant is an inhabitant or wherever the defendant

may be found." Here again, however, the syntax of the provision is not spacious enough to accommodate appellants' argument. The phrase "such action" in the fourth sentence of subsection (c) refers back to the immediately preceding sentence—the third sentence—which, as we have seen, is confined to "[a]ny action brought under subsection (a)." This textual understanding is confirmed by the Senate Report on the Futures Trading Practices Act of 1992, which states, *inter alia,* that the Act "amends [sub]section 22(c) of the Commodities Exchange Act to authorize nationwide service of process in . . . private actions brought under [sub]section 22(a) of the Act," S.Rep. No. 102–22, at 58, *reprinted in* 1992 U.S.C.C.A.N. 3103, 3160.

In sum, the District Court was correct in ruling that, with respect to (a) appellants' state law claims against Stone and Delbridge, and (b) appellants' federal law claim against these two individual defendants, *in personam* jurisdiction was lacking.

### B. Liability under Section 22 of the CEA

The District Court dismissed all three federal claims against the defendant FCMs. On appeal, plaintiffs have chosen not to press their claims arising under RICO, thereby limiting themselves to arguing for the revival of the remaining two federal claims, namely, that the FCMs (1) directly violated, and (2) aided and abetted in the violation of, the CEA.

Subsection 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1),[12] creates a private right

---

12. Subsection 22(a)(1) provides, in full:

Any person (other than a contract market, clearing organization of a contract market, licensed board of trade, or registered futures association) who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person—

(A) who received trading advice from such person f or a fee;
(B) who made through such person any contract of s ale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

of action for "actual damages" caused by "[a]ny person ... who violates this chapter [the CEA] or who willfully aids [or] abets ... the commission of a violation of this chapter."

### i. Liability for direct violation of the CEA

A plaintiff may bring a private damage action against "[a]ny person who violates" the CEA when that person stands in one of four relationships with the plaintiff specified in subparagraphs (A) through (D) of subsection 22(a)(1). *See* 7 U.S.C. § 25(a)(1)(A)-(D). Each of the required relationships involves the "person" sued having given advice related to the sale of commodities, or having participated in a transaction related to such sales. Subparagraph (A) imposes liability on the "person" sued when a plaintiff "received trading advice from *such person* for a fee"; subparagraph (B) imposes liability on the "person" sued when the plaintiff "made through *such person*" a contract for futures or options thereon, or when the plaintiff deposited money or other property with "*such person*" in connection with a futures or options contract; subparagraph (C) imposes liability on the "person" sued when the plaintiff purchased from or sold to "*such person,*" or placed through "*such person*" an order for, certain specified options or commodities contracts, or "an interest or participation in a commodity pool"; and subparagraph (D) imposes liability on the "person" sued when the plaintiff "purchased or sold a contract referred to in subparagraph (B) if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract." (Emphasis added). If the "person" sued has

participated in one of the transactions specified in these four subparagraphs, then "such person" can be held liable "for actual damages resulting from one or more of the [specified] transactions ... and caused by such violation" to the plaintiff. Thus, in order for a plaintiff to sue a defendant for directly violating subsection 22(a)(1), the defendant must (1) have violated the CEA, and (2) stand in an appropriate relationship to the plaintiff with respect to the violative conduct.

Appellants, in their amended complaint, alleged that the FCMs were liable under subsection 22(a)(1) to plaintiffs because of their participation in transactions described in subparagraphs (A), (B), and (C). In particular, appellants alleged that the defendant FCMs gave trading advice to Kohli, who was, so appellants alleged, in some sense, appellants' agent. Similarly, appellants alleged that the FCMs accepted orders of the kind described in subparagraph (B) from Kohli. And finally, appellants contended that the FCMs fell under subparagraph (C) insofar as they permitted Kohli, Ramchandran, and Sigma to sell to appellants interests in commodity pools in violation of the CEA.

■ Appellants do not contend that the defendant FCMs themselves stood in one of the listed relationships to one or more of the appellants. Instead, appellants argue that the FCMs were directly liable by virtue of a relationship between the FCMs and an agent of the appellants. According to appellants, the conclusion that "Defendant FCMs were dealing directly with Plaintiffs for purposes of violating 7 U.S.C. § 25(a)(1)(A)-(D)" follows from the fact that "Kohli, the acknowledged primary violator was the Plaintiff's [sic] agent." The

(C) who purchased from or sold to such person or p laced through such person an order for the purchase or sale of—
(i) an option subject to section 6c of this title (other than an option purchased or sold on a contract market or other board of trade);
(ii) a contract subject to section 23 of this title; or
(iii) an interest or participation in a commodity pool; or
(D) who purchased or sold a contract referred to i n subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

7   U.S.C. § 25(a)(1).

District Court rejected appellants' theory, stating that "[p]laintiffs have provided no authority for allowing a [subsection 22(a)(1) ] relationship to be established through an agency theory and there is no indication in the statute indicating the availability of such relief." *Nicholas v. Stone*, slip op. at 24. Without deciding whether or to what extent an agency relationship can ever appropriately be used to establish a subsection 22(a)(1) relationship, we agree with the District Court that the agency theory invoked by appellants does not fit this case. For, as the District Court stated, "allowing such a theory in the instant case, where Kohli, although technically the agent of the plaintiff[s], was clearly not operating in plaintiffs' interests does not seem appropriate." *Id.* Accordingly, the FCMs' transactions with Kohli (and/or Ramchandran and/or Sigma) do not suffice to make them liable to appellants under subsection 22(a)(1).[13]

We turn, then, to appellants' alternate subsection 22(a)(1) theory—namely that the defendant FCMs can be found liable to appellants by virtue of having "aided and abetted" Kohli (and/or Ramchandran and/or Sigma) in violating the CEA.

### ii. *Liability for aiding and abetting violation of the CEA.*

The District Court held that the FCMs could not be liable under subsection 22(a)(1) as aiders and abetters based on its view that, in order to establish aider-and-abetter liability, a defendant must be in one of the four subparagraph-(A)-through-(D) relationships with a plaintiff. *See Nicholas v. Stone*, slip op. at 26–27. The District Court, following its previous deci-

sion in *Manley v. Stark & Stark*, Civ. No. 97–524 (D.N.J.), reached this conclusion on the basis of language in subsection 22(a)(1) which appears to treat direct and aider-and-abetter liability in parallel terms. Thus, for example, subsection 22(a)(1) provides, "*Any person* who violates this chapter or who willfully aids [and] abets ... the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the [specified] transactions ... and caused by such violation to any other person—(A) who received trading advice from *such person* for a fee." 7 U.S.C. § 25(a)(1) (emphasis added). Each of the specified transactions in subparagraphs (A), (B), and (C) (the three subparagraphs invoked in the amended complaint) involves activity by "such person"—the antecedent of which appears to be a "person who violates this chapter or who willfully aids [and] abets ... the commission of a violation."[14] Accordingly, the syntactic structure of the statute seems to contemplate that "any person" who aids and abets can only be held liable if he is also "such person," *i.e.*, a person who performs one of the acts enumerated in (A), (B), and (C). Under this reading of the statute, it would appear that—just as with direct violators of the CEA—a plaintiff can bring private causes of action against aiders and abetters only if they (1) aid and abet a violation of the CEA; *and* (2) themselves stand in one of the relationships specified in subparagraphs (A), (B), and (C).

The District Court noted that its reading of the statute was consistent with that of the majority of district courts that had discussed the issue of the scope of aiding

---

**13.** Under traditional concepts of agency law, it is the wrong-doing agent of the principal/merchant, not the wrong-doing agent of the victim/ investor, who creates liability for the principal. Such is clearly not the case before us. For that reason, we will not comment on a situation in which the wrong-doer is the agent of the merchant rather than of the investor.

**14.** Although subparagraph (D) does not expressly refer to "such person," its operative focus is on transactions involving "a contract referred to in subparagraph (B)." We need not, however, address the ingredients of aider-and-abetter liability under subparagraph (D), since as the District Court noted, the amended complaint focused on transactions allegedly falling within subparagraphs (A), (B), and (C).

and abetting liability under subsection 22(a)(1) of the CEA. *See, e.g., In re Lake States Commodities, Inc.*, 936 F.Supp. 1461, 1467 (N.D.Ill.1996) ("[U]nder the plain language of these provisions, a plaintiff must demonstrate that a defendant is one of the 'such persons' listed in § 22(a)(1)(A)(D) in order to hold that defendant liable under the CEA."); *Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 878 F.Supp. 1156, 1161 (N.D.Ill.1995) ("[B]ased upon the plain language of the statute, the court finds that the only persons subject to a private right of action under § 22(a)(1)(C)(ii) of the CEA are the persons who sold or took orders for interests in the commodity pool."); *Davis v. Coopers & Lybrand*, 787 F.Supp. 787, 794 (N.D.Ill.1992) ("By its literal and plain language, the 'such person' specification in CEA § 22(A)(1)(C) limits the statutory remedy to obtaining damages from the persons who sold or took orders for interests in the commodity pool.").

In holding that only "such persons" can be liable as aiders and abetters under subsection 22(a)(1) of the CEA, the District Court expressly rejected the position of the Commodities Futures Trading Commission ("CFTC"), as expressed in an *amicus curiae* brief, which had been filed by the CFTC in the then-pending appeal to the Seventh Circuit in *Damato v. Hermanson* (an appeal from the district court decision in *Damato v. Merrill Lynch, Pierce, Fenner & Smith*, cited *supra*), and which had been presented to the District Court in the present case by plaintiffs. The CFTC, in that brief, had argued that the reading adopted by the district court in *Damato* would unnecessarily limit aider and abetter liability:

> Indeed, requiring that the aider and abetter be "such person" within the meaning of subparagraphs (A) through (D) renders § 22(a) internally inconsistent and does violence to the clear intent of § 22. As indicated above, § 22(a)(1)(A)-(D) defines the persons who are appropriate plaintiffs under the CEA. It also sets forth the damages that may be recovered in a private right of action. It limits recovery to damages caused by the violation and "resulting from one or more of the transactions referred to in subparagraphs (A) through (D)." If "such person" under subparagraphs (A) through (D) referred to the aider and abettor (*i.e.*, if the aider and abettor were required to have the direct relationship with plaintiff), then the only damages recoverable would be those resulting from the transaction between the aider and abettor and the plaintiff. This is nonsensical, because the plaintiff's damages result not from the act of the aider and abettor in providing trading advice or selling futures, options or pool interests to the plaintiff, but from the violation itself by the primary violator.... Thus, for the language of § 22 to make sense, "such person" in subparagraphs (A) through (D) must refer to the primary violator and not the aider and abettor.

App. at 294–95 (reprinting the *amicus* brief of the CFTC).

Thus, according to the CFTC, "§ 22(a) creates liability for an aider and abettor if (i) he or she assists in a violation of the Act, (ii) the plaintiffs' damages are caused by that underlying violation and (iii) the damages result from one of the transactions set forth in subparagraphs (A)-(D). There is no independent requirement that *both* the primary violator and the aider and abettor deal directly with the plaintiff." *Id.*

After the District Court handed down its order dismissing the amended complaint, but prior to our consideration of this case, the Seventh Circuit handed down its decision in *Damato*. That court rejected the so-called "plain-language" interpretation because it "effectively reads out of the text Congress' specific reference to aiders and abettors in 22." *Damato v. Hermanson*, 153 F.3d 464, 470 (7th Cir.1998). Instead, stating that "[b]y definition, an aider and abettor knowingly contributes to the prin-

cipal's violation rather than committing an independent violation of its own," the Seventh Circuit adopted the CFTC interpretation of subsection 22(a)(1). *Id.*

In the instant case, appellants urge this court to follow the Seventh Circuit's adoption, in *Damato*, of the CFTC approach to subsection 22(a)(1)'s aiding and abetting language. By contrast, appellees argue, contra *Damato*, that this court should look to the plain language of subsection 22(a)(1), and that—because the FCMs and their employees took no action described in subparagraphs 22(a)(1)(A) through (C)—the FCMs should not be liable as aiders and abetters. We find it unnecessary, however, to resolve this issue at this juncture. For even assuming that we were to follow *Damato*'s adoption of the CFTC approach, the defendant FCMs could, in any event, only be held liable if their conduct met the basic requirements of aiding and abetting. But plaintiffs, in their amended complaint, have not alleged such conduct.

The *Damato* court analyzed the elements of aider and abetter liability under subsection 22(a)(1) as being identical with those contemplated by the federal criminal aider and abetter statute, 18 U.S.C. § 2. *See* 153 F.3d at 473. It therefore concluded that "in order to state ... a claim against [a defendant] ... plaintiffs must allege that [the defendant] (1) had knowledge of the principal's ... intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." · *Id.* The Seventh Circuit thus recognized that to be an aider and abettor one must (a) have knowledge of the principal's intended violation of the statute, and (b) have the intent to promote that principal's violation. This interpretation is consistent with both the traditional understanding of what is meant by "aiding and abetting" and with the language of subsection 22(a)(1), which contemplates liability for one "who *willfully* aids [and] abets ... the commission of a violation" of the CEA. (Emphasis added). We agree with the Seventh Circuit that aiding and abetting in the context of the CEA is congruent with aiding and abetting as defined by 18 U.S.C. § 2. Plaintiffs, however, have not alleged that the defendant FCMs had the required knowledge and guilty intent. Thus, their allegations fall short of stating a claim that defendants aided and abetting in violations of the CEA, regardless of whether such a claim requires allegations that defendants engaged in activity described in subparagraphs (A) through (C) of subsection 22(a)(1).

The principal thrust of the allegations in the amended complaint is that the FCMs did not adequately supervise Kohli, Ramchandran, and Sigma. *See, e.g.*, Amended Complaint, ¶ 104 ("Had the FCMs diligently supervised the activities of ... Kohli, Chandran[15] and the Sigma Entities, or made any reasonable investigation of the practices of Kohli, Chandran and the Sigma Entities, the FCMs would have discovered Kohli's, Chandran's and the Sigma Entities' fraudulent investment scheme and the material misrepresentations and omissions."). The closest that the amended complaint comes to alleging that the FCMs knew of the misconduct of Kohli, Ramchandran, and Sigma are the statements that the FCMs "were aware, or with required minimal due diligence would have discovered" that "Kohli, Chandran and the Sigma Entities were a fiction under the CEA," *id.* at ¶ 128, and that the FCMs "knew or recklessly disregarded facts showing that" Kohli, Ramchandran, and the Sigma Entities were engaged in various activities violative of the CEA. *Id.* at ¶ 133. In essence, appellants have al-

---

**15.** "Chandran" and "Ramchandran" are names for the same person. In their amended complaint, appellants used the name "Chandran" to refer to the person called "Ramchandran" in the District Court's opinion. We have followed the District Court, thereby creating a discrepancy between the name we have generally used and the name appearing in quotations from the amended complaint.

leged, at most, that the FCMs acted recklessly, and that they knew or should have known of the violations by Kohli, Ramchandran, and Sigma of the CEA. But these allegations are a far cry from an allegation that the FCMs not only had knowledge of the intent of Kohli and the others to violate the CEA, but, as the Seventh Circuit put it in *Damato*, "the intent to further that violation." 153 F.3d at 473. Accordingly, even if we were to assume *arguendo* the correctness of the CFTC construction of subsection 22(a)(1)—namely, that "for the language of § 22 to make sense, 'such person' in subparagraphs (A) through (D) must refer to the primary violator and not the aider and abettor"—which was adopted by the Seventh Circuit in *Damato*, plaintiffs' amended complaint nonetheless falls short. Therefore, we conclude that the District Court acted properly in dismissing appellants' aiding and abetting claims.

### C. Remaining Claims

In addition to the issues discussed above, appellants urge this court to reverse the District Court's determination that each of their state law claims against the FCMs should be dismissed as well. The claims include breach of contract, breach of fiduciary duty, negligence, fraud and civil conspiracy, violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8–1, *et seq.*, and violation of the New Jersey Uniform Securities Law, N.J.S.A. 49:3–47, *et seq.* Additionally, appellants contest the District Court's dismissal of plaintiffs' claims against the NFA. We find the District Court's discussion of these issues to be cogent and persuasive, and therefore adopt the conclusions reached by the District Court with respect to each of these issues.

### III. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.