Lakeisha WILSON–BEY, Appellant,

v.

UNITED STATES, Appellee,

and

Sckeena Marbury, Appellant,

v.

United States, Appellee.

Nos. 01–CF–293, 01–CF–633.

District of Columbia Court of Appeals.

Argued En Banc March 20, 2006.

Decided July 20, 2006.

John O. Iweanoge, Jr., Washington, DC, for appellant Lakeisha Wilson–Bey.

Matthew M. Hoffman, with whom John Moustakas and Stephen R. Galoob, Wash-

ington, DC, were on the brief, for appellant Sckeena Marbury.

David B. Goodhand, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney, and Roy W. McLeese III and Lynn C. Holliday, Assistant United States Attorneys, were on the brief, for appellee.

Andrea Roth, with whom James Klein and Samia Fam were on the brief, for Public Defender Service, amicus curiae.

Before WASHINGTON, Chief Judge, FARRELL, RUIZ, REID, GLICKMAN, and KRAMER, Associate Judges, and WAGNER and SCHWELB,* Senior Judges.

SCHWELB, Senior Judge:

Following a jury trial, Lakeisha Wilson–Bey and Sckeena Marbury, who are sisters, were both convicted of first-degree premeditated murder while armed, in violation of D.C.Code §§ 22–2401, –3202 (1996).[1] The two women were also found guilty of several other offenses stemming from the same homicide.[2] The prosecution's theory at trial was that Ms. Wilson–Bey, who was twenty-one years old at the time that the offenses were committed, was the principal in the premeditated murder of Tomika Blackwell, and that Ms. Marbury, who was then eighteen, participated as an aider and abettor.

Both women appealed from their convictions, contending principally that the trial judge instructed the jury erroneously with respect to the "intent" element of "aiding and abetting" first-degree premeditated murder. Specifically, appellants claim that the trial court committed reversible error, in the context of this case, by instructing the jury that "[a]n aider and abettor is legally responsible for the natural and probable consequences of the crime in which [s]he intentionally participates."

On April 7, 2005, a division of this court affirmed appellants' convictions. *Wilson–Bey v. United States*, 871 A.2d 1155 (D.C. 2005) (*Wilson–Bey I* ). The division noted the existence of substantial authority casting doubt on the appropriateness of the "natural and probable consequences instruction," *id.* at 1161–62, 1165–66, but concluded that then-binding precedent in this jurisdiction required affirmance of the convictions. *Id.* at 1163–64. The members of the division expressed the view that consideration of the issue by the en banc court may be warranted. *Id.* at 1166.

---

* Judge Schwelb was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on June 24, 2006.

2. These offenses were the following:

| | |
|---|---|
| Conspiracy to Commit Murder and Assault | D.C.Code §22-105 a (1996), recodified in §22-1805 a (2001); |
| Assault with a Dangerous Weapon | D.C.Code §22-502 (1996), recodified in §22-402 (2001); |
| Aggravated Assault While Armed | D.C.Code §§22-504.1, –3202 (1996), recodified in §§22-404.01, -4502 (2001); |
| Malicious Destruction of Property | D.C.Code §22-403 (1996), recodified in §22-303 (2001); |
| Threats to Injure a Person | D.C.Code §22-2307 (1996), recodified in §22-1810 (2001); |
| Carrying a Dangerous Weapon | D.C.Code §22-3204(a) (1996), recodified in §22-4504(a) (2001). |

1. This offense is now recodified in D.C.Code §§ 22–2101, –4502 (2001).

Each appellant petitioned the full court to rehear the case, and on November 2, 2005, we granted both petitions and vacated the opinion of the division in *Wilson–Bey I. See Wilson–Bey v. United States,* 886 A.2d 77 (D.C.2005) (per curiam) (en banc) (*Wilson–Bey II* ). We now hold that the trial court's instruction regarding the requisite intent was erroneous, for in any prosecution for premeditated murder, whether the defendant is charged as a principal or as an aider or abettor, the government must prove all of the elements of the offense, including premeditation, deliberation, and intent to kill. Because the instruction given in this case omitted the *mens rea* element of the offense charged, the error was of constitutional magnitude. Concluding that the erroneous instruction was prejudicial as to Ms. Marbury but harmless beyond a reasonable doubt as to Ms. Wilson–Bey, we reverse Ms. Marbury's conviction of premeditated murder while armed. With a single exception unrelated to the principal issue before us, we affirm Ms. Marbury's other convictions and all of Ms. Wilson–Bey's convictions.[3]

# I.

## THE TRIAL COURT PROCEEDINGS

### A. *The evidence.*

The facts relevant to these appeals were described in *Wilson–Bey I,* 871 A.2d at 1157–59, and we summarize them briefly, borrowing liberally from the division's narrative. On the evening of January 16–17, 2000, several young women were playing cards in an apartment in southeast Washington, D.C. An argument broke out between the decedent, Tomika Blackwell, and appellant, Sckeena Marbury, who had been drinking heavily. After the two women, whose quarrel was causing a disturbance, left the apartment at the request of their hostess, the dispute escalated from words to blows, and Ms. Blackwell easily bested Ms. Marbury in the fight that followed. At the conclusion of the encounter, Ms. Marbury was lying on the ground with a bloody nose, a knot on her head, a busted lip, and an injured eye. By all accounts, Ms. Marbury was both drunk and angry.

In the hours after her beating, Ms. Marbury related to several of her friends that she had been "jumped" by Tomika Blackwell and two of Tomika's alleged confederates. According to Teresa Brown, in whose car Ms. Marbury was riding away from the scene of the fight, a "ranting and raving" Ms. Marbury proclaimed that "I'm coming back. I'm going to kill that bitch."[4] Appellant Lakeisha Wilson–Bey, who had clashed with Ms. Blackwell on a previous occasion,[5] was notified of her younger sister's beef, and resorting to terminology identical to that allegedly used by Ms. Marbury, she stated in front of the group of young women that

3. The parties agree, and so do we, that the appellants' convictions for assault with a dangerous weapon merge into their convictions for aggravated assault while armed. Accordingly, both appellants' convictions for assault with a dangerous weapon must be vacated.

4. Ms. Brown was, however, impeached with convictions for theft and false pretenses, and with a statement to the police in which she failed to mention Ms. Marbury's threat to kill the decedent. *See also Wilson–Bey I,* 871 A.2d at 1166 n. 20 (trial judge did not err in limiting cross-examination of Ms. Brown regarding her failure to volunteer to the grand jury that Ms. Marbury threatened to kill the decedent).

5. Ms. Blackwell's friend, Diamonika Thompson, was dating a man with whom Ms. Wilson–Bey had previously been involved. Both appellants apparently blamed the decedent for this development, which may have precipitated the fight between Ms. Blackwell and Ms. Marbury. There was also testimony, however, that Ms. Marbury described the situation as being her sister's problem, not her own.

had gathered in the wake of the fight that she was going to "kill that bitch." [6] Eventually, the group of eight, including both appellants, armed themselves with knives and baseball bats and set out in a van for Ms. Blackwell's apartment. Their ostensible plan was to find out why Ms. Marbury had been beaten up and to avenge Ms. Marbury by fighting Ms. Blackwell and her friends. All of the women in the van were subsequently charged with first-degree premeditated murder while armed, but several of them agreed to cooperate with the government in exchange for negotiated plea agreements, and three testified at trial against the appellants.[7] The facts described below are based largely on their testimony and that of Ms. Blackwell's boyfriend, Arnold Rucker. The prosecution witnesses were all impeached, at least in some measure, but there was evidence which, if credited, would permit an impartial jury to find that both appellants set out deliberately to murder Ms. Blackwell in retaliation for her having beaten up Ms. Marbury, and that Ms. Wilson–Bey repeatedly stabbed the decedent, thus carrying out this premeditated plan. The sufficiency of the evidence cannot be persuasively disputed by either appellant.

The van in which the eight young women traveled to seek out Ms. Blackwell was owned and driven by appellants' friend, Angel Lewis. When the vehicle arrived outside Ms. Blackwell's apartment house, the two appellants and their friend Lashawn Miller ran up to Ms. Blackwell's unit, Apartment 304. According to prosecution witnesses, Ms. Wilson–Bey had a large butcher knife or steak knife [8] in her hand, and Ms. Marbury was carrying both a bat and a knife. The other occupants of the van, several of them armed, followed the initial trio up the stairs.

At the time the appellants arrived on the scene, Ms. Blackwell was inside the apartment with Mr. Rucker and another woman. Rucker became aware of the commotion outside, and he heard someone calling for Ms. Blackwell. Rucker opened the door, and he observed what he described as "a rack of females" in the hall. He testified that several of the women were carrying weapons. Rucker did not know Ms. Wilson–Bey,[9] but he recognized Ms. Marbury as the young woman whom Ms. Blackwell had fought and bested earlier that night. According to Rucker, Ms. Wilson–Bey was at the head of the group, holding a butcher knife, and she asked for Tomika. Ms. Blackwell walked to the door, stood behind Rucker, and announced: "I'm right here." Although she was not armed, Ms. Blackwell advanced on Ms. Wilson–Bey. Rucker tried unsuccessfully to restrain Ms. Blackwell, but while he was attempting to do so, Ms. Wilson–Bey swung the knife at Ms. Blackwell several times, inflicting a stab wound near her victim's right eye. Ms. Blackwell, bleeding profusely, nevertheless tried to fight her knife-wielding assailant. The two women struggled on the floor, with Ms. Blackwell on top, and during the ensuing melee, Ms. Wilson–Bey (and apparently one or more other assailants) [10] stabbed

6. Ms. Wilson–Bey also allegedly used the expression "fuck [her] up" with respect to her plans for Ms. Blackwell.

7. Ms. Wilson–Bey's attorney called two of the "cooperating witnesses" to testify on his client's behalf.

8. Arnold Rucker, Ms. Blackwell's boyfriend, described the knife as "the biggest size that come[s] in the set."

9. Rucker was subsequently unable to identify Ms. Wilson–Bey's photograph in a photo array, but he did identify her in court.

10. Gravely injured, Ms. Blackwell said that "[t]hose bitches stabbed me" and that "I'm going to die this time." The decedent thus evidently believed that Ms. Wilson–Bey was not the only person who stabbed her. There was also expert testimony that Ms. Black-

Ms. Blackwell several more times. One witness testified that Ms. Marbury struck Ms. Blackwell with a bat while Ms. Wilson–Bey was stabbing her; according to Rucker, however, Ms. Marbury was initially just standing there, crying.[11]

At approximately 4:00 a.m. on January 17, officers from the Metropolitan Police Department arrived at the apartment. They found Ms. Blackwell unconscious, and she was suffering from multiple wounds to the face and body. The officers transported Ms. Blackwell to D.C. General Hospital. At 4:30 a.m., Tomika Blackwell was pronounced dead.

Ms. Blackwell was not the only person who suffered injury to person or property as a result of the criminal activities of the appellants and of the other members of their group. Arnold Rucker was stabbed in the arm, and although he left the hospital before being treated,[12] he later testified that he suffered intense pain for two weeks, and the wound left a large scar. Moreover, after the appellants and their friends left Ms. Blackwell bleeding to death in her apartment, they proceeded to the home of Teresa Brown, in whose car Ms. Marbury had earlier left the scene of the fight; they did so because Ms. Marbury had stated that Ms. Brown was one of the women who had joined Ms. Blackwell in attacking Ms. Marbury. Upon arrival at Teresa Brown's apartment house, the women tried to locate Ms. Brown's unit, and they yelled at Ms. Brown to come out. Ms. Wilson–Bey allegedly threatened to kill Ms. Brown; Ms. Marbury allegedly made a similar threat to Ms. Brown's fiancé. When Ms. Brown declined to leave her apartment, several of the women took turns stomping on Ms. Brown's automobile, and they shattered the car windows, inflicting over $700 worth of damage. There was also evidence that after the women had left Ms. Brown's car and apartment and completed the night's revenge-seeking activities, Ms. Wilson–Bey telephoned her brother and gave him the names of all the women who were present at the homicide, thereby implying a threat of reprisal in case any of them "snitched."

A forensic pathologist called by counsel for Ms. Wilson–Bey testified that Ms. Blackwell died as a result of a stab wound in the neck. The witness opined that the fatal injury had been inflicted by a small knife with a narrow blade, and that it could not have been caused by a knife as large as the one Ms. Wilson–Bey was alleged to be carrying.[13] At the trial, Ms. Wilson–Bey's attorney contended that his client neither killed the decedent nor intended to kill her; he also argued that Ms. Wilson–Bey was acting in self-defense. Ms. Marbury's defense was essentially that she was hopelessly drunk and that she took no part in the armed assault on Ms. Blackwell. Neither appellant testified.

B. *The aiding and abetting instruction.*

The issue that led this court to consider this case en banc initially arose at trial when the prosecutor—not either defense attorney—asked for a modification of the Redbook Instruction [14] on aiding and abet-

---

well's death was caused by wounds inflicted by a knife smaller than the one that Ms. Wilson–Bey was carrying.

11. Rucker stated, however, that at some point, Ms. Marbury began swinging her knife; there was also testimony that she threw a bat at Rucker. The evidence of the various witnesses regarding Ms. Marbury's actions at the scene of the homicide was contradictory and inconsistent.

12. Rucker was apparently wanted by the police.

13. There was also testimony that one of the appellants' friends subsequently discarded this knife at Ms. Wilson–Bey's direction.

14. CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA (4th ed.1993), Instruction 4.02.

ting. The prosecutor's stated goal was to ensure that the government would not be required to prove, in order to secure a first-degree conviction, that Ms. Marbury premeditated the murder or specifically intended that the decedent be killed. Although the government had identified Ms. Wilson–Bey as the principal in the armed premeditated murder of Ms. Blackwell,[15] the prosecutor contended that, as an aider or abettor, Ms. Marbury was guilty of the same offense. The prosecutor argued that Ms. Marbury

> did not have to go with the specific intent to commit the ultimate crime, which in this case would be the killing. [A]ll [that] would be necessary was that she participate in some unlawful manner while present and that she have some desire to participate and to make whatever the unlawful purpose was to succeed in this case.

Subsequently, the prosecutor added:

> [O]ur concern is that the jurors would think that the crime in this case is the ultimate crime which was the murder, as opposed to the defendant being guilty if they [sic] participated in any unlawful way at the scene, whether there was the intent to kill, which was the crime, or merely participated in the assault.
>
> ... I want the jury ... to be clear that as long as they're there and participating [in] the assault, what's going on on that platform, then [all] the defendants can be found guilty [of premeditated murder while armed]. This all goes to foreseeability, natural and reasonable consequences of the acts. I just don't

want them to hold the defendants to the commission of the murder.

In order to make it clear to the jury that Ms. Marbury could properly be convicted of armed premeditated murder without intending that Ms. Blackwell be killed, the prosecutor asked the trial judge to modify Instruction 4.02 (Aiding and Abetting) of the 1993 Redbook by making intentional participation in a "criminal venture" (and not merely in a specific crime) a sufficient basis for conviction of first-degree premeditated murder while armed. The judge expressed agreement with the prosecutor's approach, and over defense objection,[16] he modified Redbook Instruction No. 4.02 by adding the language italicized below:

> Any person who in some way intentionally participates in the commission of a crime *or a criminal venture,* aid[s] and abets the criminal offender. She, therefore, is as guilty of the crime as she would be if she had personally committed each of the acts that make up the crime.
>
> To find that the defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated herself with the person who committed the crime *or criminal venture,* that she participated in the crime *or criminal venture* as something she wished to bring about, and that she intended by her actions to make it succeed.

(Emphasis added.) [17]

Quoting two bracketed sentences from the Redbook instruction, the judge also

---

**15.** The government also asserted that if the proof was insufficient to prove that Ms. Wilson–Bey was guilty as the principal, she was nevertheless liable for premeditated murder as an aider and abettor.

**16.** Ms. Marbury's counsel took the lead in making and arguing this objection. Ms. Wilson–Bey's attorney stated that he was joining counsel for Ms. Marbury in his objection to the aiding and abetting instruction.

**17.** The judge defined the criminal venture as follows:

> Now, when I refer to criminal venture, the criminal venture in this case was to assault and murder Tomika Blackwell and to assault Teresa Brown and Diamonika Thompson.

charged the jury:

It is not necessary that the defendant have had the same intent that the principal offender had when the crime was committed or *that she have intended to commit the particular crime by the principal offender.* An aider and abett[o]r is legally responsible for the acts of other persons *that are the natural and probable consequences of the crime or criminal venture in which she intentionally participates.*

(Emphasis added.) In light of the foregoing italicized language, the court's instruction did not require the prosecution to prove that Ms. Marbury acted upon a premeditated design to kill Ms. Blackwell, that she specifically intended Ms. Blackwell's death, or even that Ms. Marbury knew that her sister (or anyone else) intended to kill the decedent. *Cf. Hackney v. United States,* 389 A.2d 1336, 1341 (D.C. 1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979) (quoting Rollin M. Perkins, Criminal Law 662 (2d ed.1969)). On the contrary, the jury was explicitly instructed that Ms. Marbury need *not* be shown to have intended to commit premeditated murder while armed, even though premeditation and deliberation are elements of that offense. *See Mills v. United States,* 599 A.2d 775, 781 (D.C.1991).

Ms. Marbury's attorney, as we have noted, objected to the insertion into Redbook Instruction No. 4.02 of the "criminal venture" language. He complained that

The reader will recall that Teresa Brown was the woman who drove Ms. Marbury from the scene of the fight and whose car was later damaged. Diamonika Thompson was the woman who was dating Ms. Wilson–Bey's former boyfriend; she was also a passenger in Ms. Brown's car. Ms. Brown testified for the government, but the prosecution did not call Ms. Thompson as a witness; she testified instead, as a defense witness, on behalf of Ms. Wilson–Bey.

[i]f you put criminal venture, it negates the same intent as the principal and it makes—just makes her responsible for anything that happens there. I mean regardless whether or not she had specific intent or whether or not she was just there. I mean—and that wording it says, look, if you're [there], regardless what happens, you're responsible for it if you use criminal venture.

Although neither defense attorney requested the judge not to give the "natural and probable consequences" instruction, Ms. Marbury's attorney did implicitly argue, in the passage quoted above, that his client, as an aider and abettor, must be shown to have "the same intent as the principal," *i.e.,* the premeditated intent to kill, in order to be guilty of premeditated murder.

Both appellants were found guilty, *inter alia,* of first-degree premeditated murder while armed. Each was sentenced to serve an aggregate term of thirty-six years to life.

## II.

## THE STANDARD OF REVIEW

In the order granting appellants' petitions for rehearing en banc, the court explicitly directed the parties to address the applicable standard of review. *Wilson–Bey II,* 886 A.2d at 78. In this case, the issue as to the proper standard arises in a somewhat unusual posture, because

In defining "criminal venture," the judge referred to "assault" and "murder," both of which are crimes. Thus, the charge as given, notwithstanding the added phrase, did not contemplate that the defendants could be convicted of armed premeditated murder on a theory that the decedent's death was a natural and probable consequence of non-criminal conduct.

1. although, in the trial court, appellants objected to a modification of the applicable Redbook instruction on grounds that, if valid, could not be reconciled with the bracketed "natural and probable consequences" language in the instruction itself, neither appellant explicitly objected to that bracketed portion of the instruction; both appellants, however, now challenge that portion on appeal; but

2. in its initial brief to the division, the government did not claim that appellants had failed to preserve the issue raised on appeal, thus arguably waiving the point and implicating the "waiver of the waiver" principle.[18] Moreover, in its brief to the en banc court, the government only perfunctorily addressed the question whether appellants' claim of instructional error was preserved and whether this court's review should be for plain error.[19]

The question whether the challenged instruction was proper—*i.e.*, what elements the prosecution must prove to show aiding and abetting of premeditated murder—is one of law. *Little v. United States*, 709 A.2d 708, 711 (D.C.1998); *accord, Brown v. United States*, 881 A.2d 586, 593 (D.C. 2005). Accordingly, our review is *de novo*, and we accord no deference to the ruling of the trial court.

■ Rule 30 of the Superior Court's Rules of Criminal Procedure provides in pertinent part:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.[20]

Because appellants did not specifically state to the trial court that aside from the references to "criminal venture," the portions of Redbook Instruction No. 4.02 now challenged on appeal should not be given, they arguably failed to state "distinctly" the matter to which they objected.[21] We conclude, however, that in objecting to the "criminal venture" language proposed by the prosecutor as a modification of the Redbook instruction, appellants urged a theory which, if it had been adopted by the

**18.** *See Wilson–Bey I,* 871 A.2d at 1156 n. 4, and authorities there cited.

**19.** In that brief, the government confined its assertion that the plain error standard applies to the first six lines of its twenty-second footnote. Although the government did frame its first question presented as whether the trial court committed plain error in instructing the jury, it has not argued anywhere in its submission that if there was error, that error was not plain. In our view, the government has come perilously close to abandoning the point that appellants' objection was not preserved. *Cf. Bardoff v. United States,* 628 A.2d 86, 90 n. 8 (D.C.1993).

**20.** While Rule 30 could be read literally to bar any review of an appellant's claim of instructional error absent an appropriate objection, the Supreme Court, in interpreting the identical federal rule, held that an appellate court may conduct a limited review of such claims for plain error. *Gordon v. United States,* 783 A.2d 575, 581–82 (D.C.2001) (*citing and following Jones v. United States,* 527 U.S. 373, 408, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)).

**21.** We note that the judge gave the now-contested bracketed portion of the Redbook Instruction, see pp. 824–25, *supra,* without any prior discussion of it, so that the defense attorney did not focus on it. The position that appellants had taken with respect to the "criminal venture" language, however, necessarily suggests that they could not have been satisfied at trial with the portion of the instruction that they have challenged on appeal.

trial judge, would have rendered illogical and self-contradictory the portions of the instruction now complained of on appeal. Given the judge's ruling on the objection to "criminal venture" and his explanation of that ruling, any further argument by defense counsel regarding the "natural and probable consequences" instruction, and any further contention that the aider or abettor must be shown to have the specific intent to kill the decedent, "would have fallen on deaf judicial ears...." *Reams v. United States*, 895 A.2d 914, 921 (D.C. 2006).

It is undisputed, as we have seen, that appellants objected to the instruction that exposed each defendant to accomplice liability if she "knowingly took part in the criminal venture." The grounds for counsel's objection were that the proposed instruction permitted an accomplice to be convicted of premeditated murder without the showing, required when the defendant is charged as a principal, that she had the specific intent to kill the decedent and that she had premeditated and deliberated. Nevertheless, the government contends, though not very forcefully, that appellants did not preserve an objection to the language making an aider and abettor "legally responsible for the acts of other persons that are the natural and probable consequences of the ... criminal venture in which she intentionally participates." Our reading of the entire record leads us to disagree.

In requesting the redefinition of "crime" to include "criminal venture," the prosecutor expressly linked that modification to the now-challenged instruction, telling the judge that the defendants could be "guilty if they participated in any unlawful way at the scene [of the homicide], whether [or not] there was the intent to kill, ... [and that this] goes to foreseeability, natural and reasonable consequences of the acts." More tellingly, the judge himself demonstrated his awareness of that link when he

rejected appellants' objection to the phrase "criminal venture." The judge stated that he did not understand why, "as a matter of law," the prosecutor's reasoning was "inaccurate," for "[i]f the ... defendant aided and abetted another in committing an assault with a knife or [with a bat,] ... that person is ... legally responsible for the acts of other persons that are the natural and probable consequence of those acts in th[e] criminal venture [in] which [she] intentionally participates." The judge thus indisputably endorsed the principle that (to use his own words) it is "not necessary that the defendant have the same intent that the principal offender had when the crime was committed." The judge also recognized that this principle derives in turn from the accomplice's "legal[ ] responsib[ility]" for the natural and probable consequences of her actions, a proposition with which the judge likewise explicitly agreed. In these circumstances, we believe that the judge was "on notice that ... [appellants'] position on the correct rule of law differed from the court's." *Russell v. United States*, 698 A.2d 1007, 1012 (D.C.1997). Accordingly, the purpose of the contemporaneous objection rule was satisfied. *See, e.g., Watts v. United States*, 362 A.2d 706, 708 (D.C.1976) (en banc). Because appellants' argument was sufficient to "direct the judge's attention to the correct rule of law," *Hasty v. United States*, 669 A.2d 127, 134–35 (D.C.1995), their failure to define the reach of their objection with "consummate clarity" is not dispositive. *Whitaker v. United States*, 617 A.2d 499, 508 (D.C.1992); *see also Russell*, 698 A.2d at 1012 ("where there was considerable discussion on the issue between counsel and the court throughout the trial, we think that counsel's failure to submit written requested instructions or to state his objections with exact precision does not compel plain error review"). Although appellants could have stated more

explicitly and clearly that they objected to the bracketed portion of the Redbook instruction as written, and not merely to the modification of the instruction by the addition of the words "criminal venture," we conclude, all things considered, that their objections passed muster.[22]

### III.

### THE REQUIRED PROOF OF INTENT

#### A. *Background.*

Before the en banc court, as before the division, Ms. Marbury's basic position, joined by Ms. Wilson–Bey,[23] is that in first-degree premeditated murder cases, the Redbook instruction on aiding and abetting is inadequate and that it understates the requisite intent. She first argued that

"[i]f the charge is first[-]degree murder based upon an alleged deliberate and premeditated killing, the abettor is not guilty of this degree of the crime unless he [or she] *either acted upon a premeditated design to cause the death of the deceased or knew that the perpetrator was acting with such an intent. ...*" *Hackney,* 389 A.2d at 1341 (emphasis added) (quoting at 662). However, Ms. Marbury also quoted another leading commentary, as follows:

To determine the kind of homicide of which the accomplice is guilty, it is necessary to look to his state of mind; it may have been different from the state of mind of the principal and they thus may be guilty of different offenses. *Thus, because first-degree murder requires a deliberate and premeditated*

---

**22.** Significantly, as we have noted, the government did not claim at all in its brief to the division that appellants had failed to preserve the objection to the natural and probable consequences instruction. This omission suggests that, at least initially, the government may have regarded Ms. Marbury's objection (joined by Ms. Wilson–Bey) that substitution of "criminal venture" for "crime" would make the defendants "responsible for anything that happened there" (regardless of their specific intent) as embracing an objection to responsibility for premeditated murder based on the natural and probable consequences standard. It was only after the division, *sua sponte,* raised the issue whether appellants' claims on appeal had been preserved, and after the division requested supplemental briefing on the point, that the government first argued that the claim made on appeal had not been preserved and that the correct standard of review was therefore for plain error.

This new turn in the government's position prompted appellants to argue that the government had forfeited its right to challenge, on appeal, the sufficiency of appellants' objection at trial to the "natural and probable consequences" instruction. *See, e.g., In re T.L.,* 859 A.2d 1087, 1090 n. 6 (D.C.2004) (explaining "waiver of the waiver" principle); *United States v. Leichtnam,* 948 F.2d 370, 375 (7th Cir.1991) ("whatever its reasoning, the gov-

ernment has now waived waiver as a defense"). The government contended, on the other hand, that its initial failure to argue for a plain error standard did not waive appellants' alleged failure to preserve their objection to the instruction, especially after the court had given the appellants the opportunity to respond to the government's belated claim that the plain error standard applied. We need not resolve this dispute, for which there is something to be said for each side. It is enough to remark that the government's initial failure to challenge the sufficiency of appellants' objection, as well as its treatment of the issue as marginal in its brief to the en banc court, reinforce our conclusion that, albeit imperfectly, the challenge to the natural and probable consequences instruction has been adequately preserved.

**23.** Although, according to the prosecution, Ms. Wilson–Bey was the principal in the premeditated murder of Ms. Blackwell, and not merely an accomplice, the contested aiding and abetting instruction potentially affected Ms. Wilson–Bey as well. In light of the expert testimony to the effect that the fatal wound could not have been inflicted by a knife as large as the one allegedly carried by Ms. Wilson–Bey, this appellant could theoretically have been an aider and abettor to another person whose stabbing of the decedent with a different weapon actually killed her.

*killing, an accomplice is not guilty of this degree of murder unless he acted with premeditation and deliberation.*

WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.2(c), at 347 (2d ed.2003) (emphasis added). Although Ms. Marbury's attorneys initially appeared to have been satisfied with the PERKINS approach, which requires intentional participation by the accomplice in the crime with knowledge of the principal's design to kill (even without proof of a specific intent to kill on the accomplice's part), they now argue, with the support of the Public Defender Service as *amicus curiae,* for the more demanding LAFAVE standard.

Ms. Marbury also complains of the use in premeditated murder cases of the bracketed "natural and probable consequences" language contained in Redbook Instruction No. 4.02, which was included in the trial judge's charge to the jury in this case. Ms. Marbury again quotes Professor LaFave:

> [G]eneral application of the "natural and probable consequence" rule of accomplice liability is unwarranted. *A's* guilt as an accomplice to one crime should not per se be a basis for holding *A* accountable for a related crime merely because the latter offense was carried out by *A's* principal, for this as well would result in *A's* guilt of a crime as to which he did not have the requisite mental state.

*Id.,* § 13.3(b), at 362–63.[24] Appellants and the Public Defender Service have cited extensive authority consistent with Professor LaFave's approach.

■ The government responds that this court's precedents have "consistently and thoughtfully" applied the "natural and probable consequences" rule, and it argues that the Redbook instruction is defensible by analogy to the rule rendering conspirators liable for substantive offenses committed by their co-conspirators in furtherance of the conspiracy. *See Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Thomas v. United States,* 748 A.2d 931, 934 (D.C. 2000). We hold that conviction of first-degree premeditated murder on an aiding and abetting theory requires the prosecution to prove that the accomplice acted with premeditation and deliberation and intent to kill, and we decline to draw the government's proposed analogy to *Pinkerton.*[25]

**B.** *The aiding-and-abetting statute and the Peoni rule.*

In assessing appellants' contentions, we begin with D.C.Code § 22–105 (1996), now recodified in D.C.Code § 22–1805 (2001), which reads as follows:

> In prosecutions for any criminal offense all persons advising, inciting, or conniving at the offense, or aiding or

---

**24.** Professor LaFave would confine the "natural and probable consequences" principle to "unique situations in which unusual principles of liability obtain." He cites as examples felony-murder and misdemeanor-manslaughter, which "permit conviction for a homicide or dangerous misdemeanor without any showing that the defendant intentionally, knowingly, recklessly, or even negligently caused the death." In such limited circumstances, according to Professor LaFave, the doctrine "is not objectionable—or, at least, no more objectionable than other applications of the felony-murder and misdemeanor-manslaughter rules." *Id.* at 363.

**25.** Our conclusion that the challenged instruction erroneously relieved the government of proving the *mens rea* element of the offense charged rests substantially on the application of principles embodied in this jurisdiction's aiding and abetting statute. We express no opinion on the validity—or constitutionality—of a similar instruction derived from a statute that, unlike the District's, defined accomplice liability partly in terms of the natural and foreseeable consequences of the abettor's actions.

abetting the principal offender, shall be charged as principals and not as accessories, the intent of this section being that as to all accessories before the fact the law heretofore applicable in cases of misdemeanor only shall apply to all crimes, whatever the punishment may be.

The District's statute was enacted by Congress in 1901, eight years before its federal analogue.[26] We have stated that "[o]ur aiding and abetting statute does not differ substantially from its federal counterpart," *Hackney*, 389 A.2d at 1342, and we can look to the federal courts' interpretation of the federal statute in construing our own.

In *United States v. Peoni*, 100 F.2d 401 (2d Cir.1938), Judge Learned Hand, writing for the court, addressed the meaning of the words "aids" and "abets" in the federal statute. Judge Hand surveyed definitions of aiding and abetting throughout centuries of common law, and he concluded as follows:

> [A]ll these definitions have nothing whatever to do with the probability that the forbidden result would follow upon the accessory's conduct; ... [T]hey all demand *that he in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.* All the words used—even the most colorless, "abet"—carry an implication of purposive attitude towards it.

*Id.* at 402 (emphasis added). The court held in *Peoni* that the defendant, who had sold counterfeit bills to a purchaser who had then resold the counterfeit money to a third person, could not be held criminally responsible for the subsequent transaction, even if it was a "natural consequence of [his] original act." *Id.* In our view, the portions of Redbook Instruction No. 4.02 which appellants have challenged in this case do not require proof that the accomplice harbored the "purposive" intent described by Judge Hand, and are therefore irreconcilable, in the context of this first-degree premeditated murder case, with the well-established *Peoni* standard.

Although *Peoni* was decided sixty-eight years ago, it remains the prevailing authority defining accomplice liability. In 1949 the Supreme Court explicitly adopted *Peoni's* purpose-based formulation. *Nye & Nissen v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949). This court has likewise followed *Peoni*, see, e.g., [Reginald B.] *Brooks v. United States*, 599 A.2d 1094, 1099 (D.C.1991); *Hackney*, 389 A.2d at 1342, and we have held that an accomplice "must be concerned in the commission of *the specific crime with which the principal defendant is charged* [;] he must be an associate in guilt of *that crime.*" *Roy v. United States*, 652 A.2d 1098, 1104 (D.C.1995) (emphasis in original).

Every United States Circuit Court of Appeals has adopted *Peoni's* requirement that the accomplice be shown to have intended that the principal succeed in committing the charged offense, and the federal appellate courts have thus rejected, explicitly or implicitly, a standard that would permit the conviction of an accomplice without the requisite showing of intent.[27] The majority of state courts have

---

**26.** The original federal aiding and abetting federal statute, initially codified in 18 U.S.C. § 550, provided that "[w]hoever directly commits an act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces or procures its commission, is a principal." The current federal statute, 18 U.S.C. § 2, states that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

**27.** *See, e.g., United States v. Wilson*, 333 U.S.App. D.C. 103, 109, 160 F.3d 732, 738 (1998) ("Although the intent of the aider and

also adopted a purpose-based standard.[28]

*See also* LaFave § 13.2(d), at 349 & n. 97.

abettor need not be identical to that of the principal, the government still was required to show that Judd had sufficient knowledge and participation to allow a reasonable juror to infer that he 'knowingly and willfully participated in the offense in a manner that indicated he intended to make it succeed. In other words, the government must show that Judd intended to bring about [the decedent's] murder. . . ."); *United States v. Ruiz,* 105 F.3d 1492, 1499 (1st Cir.1997) (to prove aiding and abetting, the evidence must show that the crime was "something [the accomplice] wished to bring about and sought by his actions to make it succeed"). *United States v. Nelson,* 277 F.3d 164, 213 (2d Cir.2002) (accomplice must be shown to have "necessary intent" that would lead to criminal liability if the principal's act had been "directly performed by him"); *Nicholas v. Saul Stone & Co.,* 224 F.3d 179, 189 (3d Cir.2000) (accessory must be shown to have both "knowledge of the principal's intended" act and "the intent to promote that principal's violation"); *United States v. Burgos,* 94 F.3d 849, 873 (4th Cir.1996) (en banc) (accomplice must be proved to have "knowledge of the result and intent to bring about that result"); *United States v. Delgado,* 256 F.3d 264, 274 (5th Cir.2001) ("To aid and abet, a defendant must share in the intent to commit the offense as well as play an active role in its commission."); *United States v. Searan,* 259 F.3d 434, 444 (6th Cir.2001) ("In order to prove association there must be evidence that the defendant shared the criminal intent of the principal"; the accomplice must be shown to have "the intent to aid in [the crime's] commission"); *United States v. Heath,* 188 F.3d 916, 921 (7th Cir.1999) (To prove that the defendant associated himself with the crime, the prosecutor "must show that the defendant shared the principal's criminal intent"); *United States v. Greer,* 467 F.2d 1064, 1068–69 (7th Cir.1972) (relying on *Peoni* and Model Penal Code in rejecting foreseeability standard for accomplice liability as one of "negligence rather than criminal intent"); *United States v. Roan Eagle,* 867 F.2d 436, 445 (8th Cir.1989) ("Aiding and abetting is not a separate crime but rather is linked to the underlying offense and shares the requisite intent of that offense."); *United States v. Ramos–Rascon,* 8 F.3d 704, 711 (9th Cir.1993) (participation in an unlawful venture not enough; accomplice must be shown to have "intentionally assisted in the venture's illegal pur-

pose"); *Johnson v. Gibson,* 254 F.3d 1155, 1163 (10th Cir.2001) (jury must be told that accomplice is not guilty of "first degree malice murder" unless he had "the specific intent to kill"); *United States v. Leonard,* 138 F.3d 906, 909 (11th Cir.1998) (aider and abettor must have "shared the criminal intent of the principal(s)"). Not all of these cases involved premeditated murder prosecutions, but each of these decisions in some measure supports the result that we reach in this case.

**28.** In suggesting that en banc consideration of the instructional issue may be appropriate, the division cited five state court decisions holding, in the context of a premeditated murder prosecution, that the government must prove that the accomplice had the specific intent to kill the victim. *Wilson–Bey I,* 871 A.2d at 1165–66 (discussing *Savage v. State,* 18 Fla. 909, 962–63 (1882); *Leavine v. State,* 109 Fla. 447, 147 So. 897, 904 (1933); *Commonwealth v. Bachert,* 499 Pa. 398, 453 A.2d 931, 935 (1982); *State v. Clemons,* 946 S.W.2d 206, 230 (Mo.1997); and *Tharp v. Commonwealth,* 40 S.W.3d 356, 365 (Ky. 2000)). In its *amicus* brief, the Public Defender Service has brought to our attention numerous additional decisions to the same general effect, including, *inter alia, Jordan v. State,* 81 Ala. 20, 1 So. 577, 586 (1887) ("When a particular intent or formed design is requisite to constitute an offense, knowledge of its existence, and a common purpose to perpetrate the offense must be shown before a person can be convicted of aiding and abetting"); *State v. Phillips,* 202 Ariz. 427, 46 P.3d 1048, 1056–58 (2002) (reversing premeditated murder conviction because state should have been required to show that accomplice had the specific intent to kill, and rejecting the theory that the conviction could stand if the accomplice "reasonably should have foreseen" the murder); *State v. Robertson,* 254 Conn. 739, 760 A.2d 82, 110 (2000) (prosecution must prove that accomplice "share[d] the criminal intent and community of unlawful purpose with the perpetrator," and "intent is a necessary element of the crime of murder whether the defendant is the principal or merely an accessory"); *State v. Fabeny,* 132 Idaho 917, 980 P.2d 581, 588 (Ct.App.1999) (because "[a]iding and abetting requires some proof that the accused either participated in or assisted, encouraged, solicited, or counseled the commission of the

Federal[29] and state[30] model jury instruc- tions are also generally consistent with

crime," the "state had to show that [the defendant] had the requisite intent to kill ... and acted in furtherance of that intent by encouraging [the principal]"); *State v. Ferguson*, 20 S.W.3d 485, 497 (Mo.2000) (en banc) ("[W]here a defendant is convicted of first degree murder as an accomplice, the state must prove that the defendant personally deliberated upon the murder."); *State v. Lantis*, 289 Mont. 480, 962 P.2d 1169, 1175 (1998) (to be guilty as an aider and abettor of "deliberate homicide," one must have "had the purpose to promote or facilitate commission of deliberate homicide"); *Sharma v. State*, 118 Nev. 648, 56 P.3d 868, 872–73 (2002) (accomplice must have specific intent to kill to be guilty of attempted murder; court "disavow[ed] and abandon[ed]" a rule based on "natural and probable consequences"); *People v. Weiss*, 290 N.Y. 160, 48 N.E.2d 306, 312 (N.Y.1943) (reversing accomplice's first-degree murder conviction because trial judge gave "normal and necessary consequences" instruction which "withdrew from the jury the necessity of finding an intent to kill"); *State v. Goode*, 350 N.C. 247, 512 S.E.2d 414, 422 (1999) (aider and abettor must "communicate" to the principal "his intention to assist in [the crime's] commission"; "[w]here a defendant aids and abets the perpetrator in the commission of a first-degree murder based on premeditation and deliberation, he shares the criminal intent of the perpetrator and thus possesses the requisite *mens rea* and specific intent for that crime"); *Johnson v. State*, 928 P.2d 309, 315 (Okla.Crim.App.1996) ("[I]n a malice murder case the State must prove the aider and abettor personally intended the death of the victim and aided and abetted with full knowledge of the intent of the perpetrator."); *State v. Diaz*, 654 A.2d 1195, 1202 (R.I.1995) (accomplice must share in principal's intent to commit charged offense; in murder case, government had to show deliberation and premeditation).

A few courts have applied a somewhat less stringent standard than that envisaged in *Peoni* and advocated in LaFave, but have required proof that the accomplice aided the principal *either* with specific intent to bring about the crime *or* with knowledge of the principal's specific intent. *See, e.g., State v. Raines*, 326 Md. 582, 606 A.2d 265, 271 (1992) ("[W]hen a specific intent is a necessary element of a particular crime one cannot be a principal in the second degree [*i.e.*, an aider-and-abettor] to that offense unless such person entertained such an intent or knew that the principal in the first degree entertained such intent"); *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74, 79 (1998) ("When a crime requires the existence of a particular intent, an alleged aider or abettor can be held criminally liable ... if ... the aider and abettor knew that the perpetrator of the act possessed the required intent or that the aider and abettor himself or herself possessed such intent."). These decisions are generally consistent with the approach in PERKINS, quoted by this court in *Hackney*, 389 A.2d at 1341. In most but not all instances, the PERKINS standard will lead to the same result as the LaFave approach, because it is a reasonable inference that one who intentionally assists the principal, with knowledge of the principal's intent, shares that intent. In a few situations, however, the results of the two approaches may diverge, *e.g.*, where, as in this case, it is claimed that the alleged accomplice, Ms. Marbury, was too intoxicated to premeditate or deliberate, or to have the specific intent to kill the decedent, even if she knew that Ms. Wilson–Bey intended to do just that.

A minority of jurisdictions follow the "natural and probable consequences" approach. *See, e.g., People v. Beeman*, 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318, 1326 (1984) ("the liability of an aider and abettor extends also to the natural and reasonable consequences of the acts he knowingly and intentionally aids and encourages"); *State v. Linscott*, 520 A.2d 1067, 1070 (Me.1987) (under a Maine statute, "[s]o long as the accomplice intended to promote the primary crime, and the commission of the secondary crime was a foreseeable consequence of the accomplice's participation in the primary crime, no further evidence of the accomplice's subjective state of mind as to the secondary crime is required"); *see also People v. Robinson*, 475 Mich. 1, 715 N.W.2d 44, 49 (2006). The cases are not always easy to categorize, for some of the decisions are based on state statutes, but to the extent that any of the decisions relied on by the government cannot be reconciled with the *Peoni* standard and the LaFave approach, we decline to follow them.

**29.** *See, e.g.,* KEVIN F. O'MALLEY *ET AL.*, FED. JURY PRACT. & INSTR. 18.01 (5th ed.2000) (accomplice must act with the "intent to commit the crime").

*Peoni*, and require proof that the accomplice intended to help the principal to commit the charged offense.

Although, as we have noted, the courts in a minority of jurisdictions have applied a "natural and probable consequences" approach to accomplice liability, it is significant that some of these courts have recently shifted to a standard consistent with *Peoni*. In *Sharma, supra* note 28, for example, the Supreme Court of Nevada reversed the conviction of an alleged aider and abettor for attempted murder (which required a showing of specific intent to kill) because the jury received a "natural and probable consequences" instruction but was not told that the accomplice "must have aided and abetted the attempt *with the specific intent to kill*." 56 P.3d at 873 (emphasis added). The court noted that the natural and probable consequences doctrine

> has been harshly criticized by most commentators as both incongruous and unjust because it imposes accomplice liability solely upon proof of foreseeability or negligence when typically a higher degree of *mens rea* is required of the principal. It permits criminal liability to be predicated upon negligence even when the crime involved requires a different state of mind. Having reevaluated the wisdom of this doctrine, we have concluded that its general application in Nevada to specific intent crimes is unsound precisely for that reason: it permits conviction without proof that the accused possessed the state of mind re-

quired by the statutory definition of the crime.

*Id.* at 871–72 (citations, internal quotation marks, and alterations omitted). Thus, "in order for a person to be held accountable for the specific intent of another under an aiding and abetting theory of principal liability, the aider or abettor must have knowingly aided the other person with the intent that the other person commit the charged crime." *Id.* at 872 The court relied on the decision of the Supreme Court of New Mexico in *State v. Carrasco*, 124 N.M. 64, 946 P.2d 1075 (1997), in which the court likewise disavowed the "natural and probable consequences" doctrine and held that "an accessory must share the criminal intent of the principal." *Id.* at 1079.

With the exception of the "natural and probable consequences" language, our own aiding and abetting instruction was likewise largely derived from the language in *Peoni*, and we have repeatedly cited that language as the standard for accomplice liability. *See, e.g., Trapps v. United States*, 887 A.2d 484, 489 (D.C.2005); *Outlaw v. United States*, 604 A.2d 873, 875 (D.C.1992); [*Reginald B.*] *Brooks*, 599 A.2d at 1099; *Hackney*, 389 A.2d at 1342. Indeed, the trial judge's instruction in this case, quoted at pp. 824–25, *supra*, contained the critical language from *Peoni*. However, the "natural and probable consequences" standard has also been invoked in this jurisdiction, even in cases, such as prosecutions for premeditated murder, in which it runs afoul not only of *Peoni*, but

---

**30.** *See, e.g.,* Ariz.Crim. Jury Instr. 3.01 (Accomplice) (accomplice's "liability extends only to offenses that the defendant intended to aid, solicit, facilitate or command"); Mass.Crim. Jury Instr. 2–10 (2005) (accomplice must "have shared the state of mind of the principal"; instruction also quotes *Peoni*); Md. State Bar Ass'n Crim. Pattern Jury Instr. 6:01 (2003) (Aiding and Abetting) (accomplice must act "with the intent to help commit the crime" and must have "willfully participated with the intent to make the crime succeed"); N.J. Standard Crim. Jury Instr. 72C:2–6 (Accomplice must have "possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act").

also of the requirement that the defendant be shown to have a deliberate and premeditated intent to kill. *See Wilson–Bey I*, 871 A.2d at 1163–64.

## C. *The natural and probable consequences standard and the Peoni rule.*

■ In *United States v. Heinlein*, 160 U.S.App. D.C. 157, 490 F.2d 725 (1973), a felony murder case, the court stated that "the accomplice who aids and abets the commission of a felony is legally responsible as a principal for all acts . . . which are in furtherance of the common design . . . or are the natural and probable consequence of acts done in the perpetration of the felony." 160 U.S.App. D.C. at 167, 490 F.2d at 735. *See also Waller v. United States*, 389 A.2d 801, 807 (D.C.1978) (quoting *Heinlein*, in a felony murder case, for the proposition that an accomplice is responsible for the foreseeable consequences of the underlying felony); *Harris v. United States*, 377 A.2d 34, 37 (D.C.1977) (also quoting *Heinlein* ). It is true, in a felony murder case, that an accomplice does not escape liability for a foreseeable death merely because he or she neither intended to kill nor pulled the trigger. To hold otherwise would be to reject the underlying purpose of the felony murder doctrine, which is designed to deter the commission of certain especially dangerous felonies because these particular crimes create an unacceptably high risk of death, and which permits the conviction of the defendant, whether she is a principal or accomplice, without any showing that she intentionally or knowingly caused the decedent's death. See discussion, *infra,* at pp. 836–37.

Nevertheless, as the division explained in *Wilson–Bey I,* the standard articulated in *Heinlein* has also been invoked in premeditated murder cases. *See, e.g., Daniels v. United States,* 738 A.2d 240, 246 (D.C.1999); *Matthews v. United States,* 629 A.2d 1185, 1197 (D.C.1993); *Byrd v. United States,* 364 A.2d 1215, 1219 (D.C.1976).[31] In the 1993 edition of the Redbook, the "natural and probable consequences" principle was included in brackets in Instruction No. 4.02, dealing generally with accomplice liability. In our view, however, the application of the bracketed language in Instruction No. 4.02 to a first-degree premeditated murder prosecution renders the instruction internally inconsistent. This is so because the language from *Peoni* that appears in the instruction requires the prosecution to prove that the accomplice knowingly associated herself with the commission of the crime, that she participated in the crime as something she wished to bring about, and that she intended by her actions to make it succeed, while the natural and probable consequences theory dispenses with any requirement that the accomplice be shown to have the requisite mental state for conviction of first-degree murder, including premeditation and specific intent to kill.

In *Oates v. State,* 97 Md.App. 180, 627 A.2d 555 (1993), Judge Charles E. Moylan, Jr., in an especially persuasive opinion, explained why the liability of each participant in criminal homicide committed by several persons must necessarily depend on his or her individual *mens rea.* Re-

---

**31.** The division affirmed appellants' convictions in this case on the basis of the then-binding authority of *Daniels* and *Byrd. Wilson–Bey I,* 871 A.2d at 1163–65. For an earlier case in which the court arguably invoked the "natural and probable consequences" standard in a first-degree murder prosecution and held that specific intent to

kill need not be shown, *see Eagles v. United States,* 58 App. D.C. 122, 125, 25 F.2d 546, 549 (1928); *cf. Patten v. United States,* 42 App. D.C. 239 (1914) (court utilized "natural and probable consequences" standard in first-degree murder case arising out of a conspiracy).

marking on the "complex matrix of blame-worthiness arising out of a single criminal homicide," the judge explained:

> When two or more persons are joint participants in a crime, they are joint participants only with respect to a single and common *actus reus*. Where, however-er, a single criminal act has different levels of blameworthiness contingent upon the particular *mens rea* with which it is perpetrated, multiple participants in that crime do not necessarily share the same *mens rea*. Although joint partic-ipation ultimately depends upon a mutu-al tie to the same criminal act, the indi-vidual *mentes reae* or levels of guilt of the joint participants are permitted to float free and are not tied to each other in any way. If their *mentes reae* are different, their independent levels of guilt, reflected by nondependent ver-dicts, will necessarily be different as well.

\* \* \*

The *mens rea* or level of blameworthi-ness of a principal in the first degree by no means controls the *mens rea* or level of blameworthiness of a principal in the second degree or of an accessory before the fact. If three codefendants burst into a motel room and discover the wife of one of them in an act of adultery, what is the crime if the two adulterers are then shot and killed? If the trigger-man (the principal in the first degree) is the cuckolded husband, the Rule of Provocation may mitigate his guilt downward to the manslaughter level. The accomplice who hands him the gun, however, will be guilty at least of mur-der in the second degree, notwithstand-ing the fact that he is aiding and abet-ting a mere manslayer. If the third codefendant, who led the suspicious hus-band to the motel room in the first place, knew full well what would there be found and had been scheming for some time thereby to get rid of the adulterous lover, his premeditated intent to kill would raise his guilt to the first degree notwithstanding the guilt of his fellow participants at lower levels. Con-versely, the principal in the first degree (the triggerman) could have possessed a premeditated intent to kill and his aider and abettor, who handed him the gun in a fit of jealous rage, might be the benefi-ciary of the Rule of Provocation.

*Id.* at 558–59.

We agree with the foregoing analysis and, in our view, application of the "natural and probable consequences" standard in the case of an alleged aider and abettor to armed premeditated murder cannot be reconciled with Judge Moylan's reasoning, which posits that each participant's re-sponsibility in a criminal homicide must turn on his or her individual intent or *mens rea*. Here, appellants were convict-ed. of premeditated murder without any requirement that the prosecution prove the requisite premeditation, deliberation, or intent. This could not be done consis-tently with *Peoni*, and the "natural and probable consequences" doctrine cannot be permitted to dilute the principle that the *mens rea* required to prove premeditated murder, whether by a principal or by an accomplice, necessarily includes premedi-tation, deliberation, and a specific intent to kill.

The *Peoni* standard is widely regarded by legal scholars as logical and just. Pro-fessor LaFave and the authors of the Model Penal Code have recognized that a "natural and probable consequences" rule imposes liability on an accomplice for the crime committed by the principal on the basis of the accomplice's negligence.[32] At

**32.** *See* LaFave, § 13.3(b) at 362; *see also* Mod-el Penal Code & Commentaries § 2.02 at 241 n. 24 (describing the "natur[al] or probable con-sequences" rule as one of "negligence").

least in the present context, we agree with Professor LaFave that a negligence-based approach contravenes basic notions of criminal responsibility:

> The "natural and probable consequence" rule of accomplice liability, if viewed as a broad generalization,[33] is inconsistent with more fundamental principles of our system of criminal law. It would permit liability to be predicated upon negligence even when the crime involved requires a different state of mind. Such is not possible as to one who has personally committed a crime, and should likewise not be the case as to those who have given aid or counsel.
>
> . . .
>
> [G]eneral application of the "natural and probable consequence" rule of accomplice liability is unwarranted. *A's* guilt as an accomplice to one crime should not *per se* be a basis for holding *A* accountable for a related crime merely because the latter offense was carried out by *A's* principal, for this as well would result in

*A's* guilt of a crime as to which he did not have the requisite mental state.

LaFave, § 13.3(b) at 362–63.[34]

Moreover, it is illogical to hold an accomplice criminally liable for an offense when the accomplice's guilt of that offense stems from his or her negligence:

> To say that the accomplice is liable if the offense . . . is "reasonably foreseeable" or the "probable consequence" of another crime is to make him liable for negligence, even though more is required in order to convict the principal actor. This is both incongruous and unjust.

Model Penal Code & Commentaries § 2.06 at 312 n. 42.[35]

A rule imposing criminal liability upon an accomplice for foreseeable consequences, without proof that the accomplice intended those consequences (while, by contrast, a principal must be shown to have the proscribed intent), is also contrary to the underlying purpose of aiding and abetting statutes, which is to "abolish the distinction between principals and accessories and [render] them all principals." *Standefer v. United States*, 447 U.S. 10, 19, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980).

**33.** As previously noted, however, this generalization does not apply to felony murder, misdemeanor manslaughter, or conspiracy, all of which the law treats differently.

**34.** Of course, in this case, the trial court's instruction would not have permitted appellants to be convicted of premeditated murder solely because they were negligent. Even with the inclusion of the words "criminal venture," the prosecution was required to prove criminal intent, *i.e.*, an intent, at least, to assault. But once the intent to commit the lesser offense had been established, then, in conformity with the trial court's charge, a defendant's failure to appreciate the natural and probable consequences of her conduct—essentially a negligence standard—could support her conviction of the far more serious crime charged in the indictment, namely, armed first-degree premeditated murder.

**35.** As noted previously, we agree with the analysis in *Oates*, which bases the degree of culpability of each participant in the crime on that participant's mental state. But application of a lesser standard of proof in the prosecution of an accomplice than of a principal, solely because she is an accomplice, is not only contrary to the *Oates* analysis, but is also in tension with the historical purpose of previous distinctions between parties, which was "to mitigate the harshness of the common law when all felonies carried the same sanction—death"—by "punish[ing] . . . the aiders and abettors . . . less severely." Baruch Weiss, *What Were They Thinking?: The Mental States of the Aider and Abettor and the Causer Under Federal Law*, 70 Fordham L.Rev. 1341, 1357 (2002).

Enforcing statutory *mens rea* requirements with respect to principals, while applying a negligence-based standard to accomplices, requires the court to make the very kinds of distinctions which the law was intended to eliminate:

> If the mental state for the principal is allowed to differ ... from that for the aider and abettor or the causer, then the jury would have to first determine in each instance whether the defendant is an aider and abettor ... or a principal, in order to know which mental state to apply. Requiring the jury to make those distinctions effectively resurrects the pre–1901 state of the law, and stands in direct contradiction to the "no distinction" rule.

*What Were They Thinking?*, 70 Fordham L.Rev. at 1365, *supra* note 35. As Judge Moylan suggested in *Oates*, guilt or the degree of guilt should turn on the mental state of each participant in the crime, and the requisite proof should not automatically be made less demanding for the prosecutor to achieve vis-a-vis one perceived to be an accomplice than with respect to a codefendant alleged to be the principal.

■ Focusing on the present appeals, it is particularly inappropriate to permit the conviction of an aider or abettor upon a lesser showing of criminal intent than is required vis-a-vis a principal when the defendants are being prosecuted for homicide. The District's statutory scheme is designed to relate the degree of the crime and the punishment of the defendant to his or her individual intent. In *Comber v. United States*, 584 A.2d 26 (D.C.1990) (en banc), this court, as part of a comprehensive examination of the District's homicide laws and of the mental state required for each form of the offense, reaffirmed that it would not be enough, in order to convict a defendant of, *e.g.*, first-degree murder, that the risk of death was reasonably foreseeable. *Id.* at 39 n. 12.[36] We therefore conclude that it serves neither the ends of justice nor the purposes of the criminal law to permit an accomplice to be convicted under a reasonable foreseeability standard when a principal must be shown to have specifically intended the decedent's death and to have acted with premeditation and deliberation, and when such intent, premeditation, and deliberation are elements of the offense.

Finally, District of Columbia law treats a killing as first-degree murder, without requiring proof of intent to kill, only under two carefully circumscribed doctrines: felony murder and conspiracy.[37] Our felony murder statute, D.C.Code § 22–2101, imposes criminal responsibility for first-degree murder in the case of a reasonably foreseeable killing, without a showing that the defendant intended to kill the decedent, if the homicide was committed in the course of one of several enumerated felonies. The statute also makes any purposeful killing during the course of any felony first-degree murder. This doctrine is premised on the notion that malice may be presumed from the commission of certain "dangerous" or "violent" felonies that "generally involve[ ] a risk that ... someone might be killed." LaFave, § 14.5(a) at 446. Felony murder is a "special crime of peculiar magnitude deemed to warrant

---

**36.** Evidence of malice is sufficient, however, to support a conviction for second-degree murder, if the defendant's conduct involved "such wanton and willful disregard of an unreasonable human risk as to constitute malice aforethought even if there is not actual intent to kill or injure," or if "the perpetrator has the specific intent to inflict serious bodily harm" (but not the specific intent to kill). *Comber*, 584 A.2d at 38–39 (quoting R. Perkins & R. Boyce, Criminal Law 59 (3d ed.1982)); *see also Wheeler v. United States*, 832 A.2d 1271, 1274 (D.C.2003).

**37.** We address the *Pinkerton* doctrine of conspirator liability in Part III.D., *infra*.

proof by unique fashion." *Shanahan v. United States*, 354 A.2d 524, 526 (D.C. 1976). Holding an accomplice, but not a principal, criminally liable for *all* unintended foreseeable killings stemming from *any* intentional crime, including less serious felonies and even misdemeanors, creates an illogical distinction between the two kinds of participants, and it cannot be reconciled with the carefully considered limits to the reach of the felony murder statute, specified by the legislature.[38]

### D. *The Pinkerton doctrine.*

In its brief to the en banc court, the government contends, for the first time,[39] that "it is difficult to draw a principled distinction" between the "natural and probable consequences" rule in the aiding and abetting context and the "parallel doctrine of *Pinkerton* liability." Contrary to the government's position, however, both the Supreme Court and this court have drawn that very distinction, and have emphasized that *Pinkerton* liability and aiding and abetting are distinct legal theories that require proof of different elements. As a result, concepts that are applicable in the *Pinkerton* context "may not be transposed to the related but distinctively different context of aiding and abetting." *Erskines v. United States*, 696 A.2d 1077, 1080 (D.C.1997) (emphasis added).

---

**38.** To avoid any misunderstanding, nothing in our opinion casts doubt on the propriety of the instruction which the trial judge gave, as part of the general intent instruction applicable to both defendants, to the effect that a jury may—but is not required to—infer that "a person intends the natural and probable consequences of [his or her] acts knowingly done or knowingly omitted." As the Public Defender Service points out, this (permissive) common-law presumption does not distinguish between principals and accomplices, nor does it expand the liability of one but not of the other. Rather, to the extent that it applies to accomplices, it does so as a logical part of its application to all defendants.

**39.** The government did not raise *Pinkerton* liability in the trial court with respect to the premeditated murder charge, and the jury was not instructed on the elements of *Pinkerton*. The government likewise did not refer to *Pinkerton* before the division at all; indeed, the table of contents of the government's brief to the division does not include a citation to *Pinkerton*. Although the government claims that a grant of rehearing en banc "turns the clock back to zero," it cites no authority for this proposition, and there is a substantial body of law to the contrary. *See, e.g., Thaddeus–X v. Blatter*, 175 F.3d 378, 403 n. 18 (6th Cir.1999) (per curiam) (en banc); *Miller v. Texas Tech Univ. Health Sciences Ctr.*, 421 F.3d 342, 348–49 (5th Cir.2005); 16 A. CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3986.1, at 731–32 & n. 8 (1999). Indeed, this court has stated that arguments in a petition for rehearing or rehearing en banc that were not presented to the division are "ordinarily ... deemed to have been waived when they are not properly raised in the first instance." *Breezevale, Ltd. v. Dickinson*, 783 A.2d 573, 575 (D.C.2001) (en banc); *see also Majerle Mgmt., Inc. v. District of Columbia Rental Hous. Comm'n*, 777 A.2d 785 (D.C. 2001) (per curiam)

Our statement in the order granting rehearing en banc, *Wilson–Bey II*, 886 A.2d at 78, that the opinion and judgment in *Wilson–Bey I* are vacated and that the parties' new briefs "shall be specifically designed for consideration by and addressed to the en banc court and shall supersede all briefs previously filed in these appeals," was a routine directive, and it was not designed to alter the normal rules of law governing the preservation of claims. Nevertheless, appellants and the Public Defender Service have had the opportunity to address the *Pinkerton* doctrine on the merits in their reply briefs, and we are satisfied that there has been no procedural unfairness. Moreover, the government's invocation of *Pinkerton* for the first time in its brief to the en banc court might reasonably be viewed not as an impermissible new "claim," but rather as a permissible new argument in support of a previously made and preserved claim. *See Yee v. City of Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992). Accordingly, we are prepared to address the government's contention on its merits.

■ As articulated by this court, the *Pinkerton* doctrine provides that "a co-conspirator who does not directly commit a substantive offense may [nevertheless] be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement." *Gordon v. United States*, 783 A.2d 575, 582 (D.C. 2001). Thus, in order to secure a conviction in conformity with *Pinkerton*, the prosecution must prove that an agreement existed, that a substantive crime was committed by a co-conspirator in furtherance of that agreement, and that the substantive crime was a reasonably foreseeable consequence of the agreement between the conspirators. *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. 1180; *Gordon*, 783 A.2d at 582. The government is not, however, required to establish that the co-conspirator actually aided the perpetrator in the commission of the substantive crime, but only that the crime was committed in furtherance of the conspiracy.

■ To establish a defendant's criminal liability as an aider and abettor, on the other hand, the prosecution need not show that an agreement existed between the principal and the accomplice. Rather, as we have seen, the government must prove, in conformity with *Peoni*, that the accomplice "in some sort associate[d] himself with the venture, that he participate[d] in it as in something he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." *Peoni*, 100 F.2d at 402.

In *Nye & Nissen*, the Supreme Court, in citing with approval the *Peoni* standard, recognized that *Pinkerton* liability differs fundamentally from liability for aiding and abetting. The Court explained the distinction as follows:

> The rule of [*Pinkerton*] does service where the conspiracy was one to commit offenses of the character described in the substantive counts. *Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy.* And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. *Pinkerton* . . . is narrow in its scope. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing. The fact that a particular case might conceivably be submitted to the jury on either theory is irrelevant. It is sufficient if the proof adduced and the basis on which it was submitted were sufficient to support the verdict.

336 U.S. at 620, 69 S.Ct. 766 (emphasis added). This court recognized the same distinction in *Erskines*, holding that "[a]iding and abetting . . . resembles *Pinkerton* liability but nonetheless differs from it significantly," because, among other things, aiding and abetting requires proof that the defendant "*intentionally* participated" in the principal's crime. 696 A.2d at 1080–81 (emphasis added).

Although the government, as we have seen, discerns what it believes to be decisive similarity between the "natural and probable consequence" standard applied by the trial judge in this case and the "reasonable foreseeability" standard of *Pinkerton*, the proposed analogy cannot withstand critical scrutiny. Reasonable foreseeability is only one of the elements that the government must prove to support a conviction under *Pinkerton*. Pursuant to that doctrine, as we have seen, the government must also prove both that an agreement existed and that the substantive offense was committed by a co-conspirator in furtherance of that agreement. By contrast, in the aiding and abetting

context, the "natural and probable consequence" standard as applied by the trial court in this case would make the aider and abettor responsible for all reasonably foreseeable crimes committed by the principal, regardless of whether there was any agreement to commit these crimes or, if there was such an agreement, irrespective of whether the principal's actions were in furtherance of it. We therefore agree with counsel for Ms. Marbury that "the extension of the 'natural and probable consequences' rule to the aiding and abetting context eliminates the other substantive limitations that make the 'reasonably foreseeable' element appropriate in the context of *Pinkerton* liability, effectively conflating the two doctrines into one omnibus and sprawling theory of vicarious criminal liability."

As we have previously noted in a different context, there are two narrowly defined doctrines that permit conviction for unintended crimes that result from intentional participation in a predicate crime, without proof of the *mens rea* otherwise required for the subsequent crime. These doctrines are felony murder and conspirator liability under *Pinkerton*. Legislatures, and sometimes courts, have carved out these exceptions to address specific especially dangerous circumstances: commission of certain serious felonies that inherently create a high risk of homicide, or participation in crimes that depend for their execution on conspiratorial agreements. Where these or similar special circumstances do not exist, *e.g.*, in cases, such as this one, which was prosecuted on an aiding and abetting theory, the *raison d'etre* for these exceptions does not apply. Significantly, under these carefully circumscribed doctrines, principals and accomplices are treated alike on the basis of each participant's mental state. *Accord, Oates,* 627 A.2d at 558–59. Accomplices are not treated more harshly than principals—*i.e.,* they are not subject to conviction on a less demanding standard of proof—solely because they are accomplices. We agree with the Public Defender Service that these narrow exceptions "prove the rule" that, in first-degree murder prosecutions which are neither for felony murder nor based upon the *Pinkerton* doctrine, a showing of *mens rea* is essential; under the government's approach, on the other hand, the exceptions swallow the rule.

Each of the two special doctrines has a unique rationale that does not exist in the markedly different context of accomplice liability.[40] The rationale of *Pinkerton,* which imposes liability on members of a conspiracy for certain acts of co-conspirators, turns on the existence of a criminal agreement. "[T]he agreement is the 'essence' or 'gist' of the crime of conspiracy." LaFave, § 12.2(a) at 266. A criminal conspiracy is an offense "of the gravest character" that implicates concerns beyond the commission of the substantive crime which is the object of the conspiracy:

> A conspiracy is a partnership in crime. It has ingredients, as well as implications, distinct from the completion of the unlawful project. .... "For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime. It involves deliberate plotting to subvert the laws, educating and preparing the conspirators for further and habitual criminal practices. And it is characterized by secrecy, rendering it difficult of detection, requiring

---

40. The purpose of the felony-murder rule, as we have explained, is to deter certain enumerated and especially dangerous felonies targeted by the legislature, because the commission of these particular crimes poses an especially high risk that death will result.

more time for its discovery, and adding to the importance of ·punishing it when discovered."

*Pinkerton,* 328 U.S. at 644, 66 S.Ct. 1180 (quoting *United States v. Rabinowich,* 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211 (1915)).

Foreseeable acts of co-conspirators in furtherance of a conspiracy are imputed to the conspirator-defendant because the co-conspirators are deemed by the law to be his agents. *Baker v. United States,* 867 A.2d 988, 1005 (D.C.2005). In principle, the law treats the co-conspirator as the conspirator-defendant's *alter ego,* and presumes him to be bound by the pre-existing conspiracy to achieve his fellow co-conspirators' shared objectives. This court has recognized the uncommon character of this aspect of conspiracy law:

> Conspiracy is a unique theory of liability that renders individual defendants guilty of any offense committed by co-conspirators in furtherance of the conspiracy.... Special evidentiary rules apply where a conspiracy is charged or alleged, and hearsay evidence ... may be introduced against a co-conspirator under the exception for admissions or statements of party opponent on the theory that one co-conspirator is the agent of another.... [*B* ]*ecause the agency theory underlies conspiracy liability,* the only admissions of party opponent admissible in a trial where the government seeks to assign vicarious liability to co-conspirators are those statements and acts of a co-conspirator *made during and in furtherance of the conspiracy.*

*Akins v. United States,* 679 A.2d 1017, 1028 (D.C.1996) (emphasis added) (citations omitted).

In contrast, a principal is not an accomplice's agent, and criminal liability attaches to the accomplice even if there is no preexisting conspiratorial agreement between the two. When the judge delivers the standard aiding and abetting instruction, he or she specifically admonishes the jury that the prosecution need not prove any prior agreement to commit the crime. *See* Redbook Instruction No. 4.02 (government need not "prove that anyone discussed or agreed upon" the criminal goal). While, in a particular case, an accomplice may also be a co-conspirator, that dual role simply permits the government to proceed on alternative theories. That the prosecution may do so, however, does not mean that the two legal doctrines have collapsed into one another.

Finally, in the present case, the government did not pursue a *Pinkerton* theory in the trial court (or, for that matter, before the division). It is therefore beyond dispute that the jury was not instructed on *Pinkerton* liability, nor did it make the findings necessary to support a conviction under that theory. In its brief to the en banc court, the government expressly concedes this point ("To be clear, we do not contend that the jury in this case was instructed on *Pinkerton* liability and made all of the *Pinkerton* findings in precisely those terms."). In particular, the jury did not find, nor was it asked to find, that the premeditated murder was committed "in furtherance of" the conspiracy, as required under *Pinkerton.* This concession by the government further undermines its *Pinkerton* argument and renders it untenable. Because the jury was not instructed on the elements of *Pinkerton* liability, a conviction for premeditated murder may not be sustained on that basis.[41]

**41.** The government's position also rests on the premise that the *Pinkerton* doctrine would necessarily allow Ms. Marbury to be convicted of premeditated murder even if she conspired only to assault Ms. Blackwell. The authorities on which the government relies for this proposition do not necessarily estab-

E. *The constitutional nature of the error.*

█ Ms. Wilson–Bey's attorney argues in his brief to the en banc court that "[t]he instructional error in this case is constitutional error because it eliminated the specific intent, premeditation and deliberation elements of first-degree murder[;] therefore, the *Chapman*[42] test should apply to this case." Counsel for Ms. Marbury, while acknowledging that they argued for the *Kotteakos*[43] standard before the division, have since changed their minds:

> Having further considered the matter, Ms. Marbury now believes that the proper standard is actually constitutional harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), which requires reversal unless the error is "harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824. This is because the trial court's instructions had the effect of eliminating the mental state element of the offense from the jury's consideration. In these circumstances, the Supreme Court has made it clear that the error is of constitutional dimension, and consequently that the *Chapman* harmless error standard should apply. *See Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (applying *Chapman* standard where court's instruction omitted element of offense.)

The Public Defender Service, as *amicus curiae*, agrees with appellants:

> Because the District's aiding and abetting statute requires proof that an accomplice acted with the mental state necessary to convict her as a principal, the government here was required to prove, in order for the jury to find Ms. Marbury guilty of first-degree murder, that she acted with a specific intent to kill after premeditation and deliberation. *See* D.C.Code § 22–2101; Redbook Instruction 4.17. But Instruction 4.02 instead required the jury to find her guilty upon proof that the murder was a "natural and probable consequence" of her involvement in a plan to assault Ms. Blackwell. By omitting three essential *mens rea* elements of the offense, the instruction violated the Sixth Amendment. *See White v. United States*, 613 A.2d 869, 872 (D.C.1992) (en banc).... The Court reviews such errors under the harmless-beyond-a-reasonable-doubt standard of [Chapman].

The government has vigorously defended the trial court's "natural and probable consequences" instruction. It has not, however, contested the proposition that if the state-of-mind elements of premeditated murder apply to aiders and abettors, then the error was of constitutional magnitude and implicates the *Chapman* standard of "harmless beyond a reasonable doubt." [44] The government likewise has

---

lish that the government's view is correct. Rather, the courts in these cases have sustained *Pinkerton* liability for premeditated murder only upon a finding that the defendant entered into a conspiracy *the object of which was to kill*. *See, e.g., United States v. Sampol*, 204 U.S.App. D.C. 349, 403–04, 636 F.2d 621, 675–76 (1980) (*Pinkerton* liability imposed for murder of Chilean ambassador and American associate because "the object of the conspiracy was the deliberate and premeditated murder" of the former); *Thomas*, 748 A.2d at 937 (*Pinkerton* liability imposed where "the assault that was the object of the

conspiracy was an assault with intent to kill, not a simple assault").

**42.** *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**43.** *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

**44.** In the 44th footnote to its brief, the government states: "[W]e do not mean to suggest that we are necessarily conceding that this instructional error implicates constitutional concerns." The brief contains no additional argument on the point.

not argued that Ms. Marbury has waived this point, and we agree with the now essentially uncontested proposition that the *Chapman* standard applies.

### F. Harmless error analysis.

#### (1) Ms. Marbury.

■ Ms. Marbury, supported by the Public Defender Service, contends that the trial judge's instructional error was prejudicial to her, rather than harmless beyond a reasonable doubt.[45] Although the case against Ms. Marbury was a strong one, we are constrained to agree.

The division unanimously concluded, and so do we, that the government's evidence, if credited, "would permit an impartial jury to find that both appellants set out deliberately to murder Ms. Blackwell in retaliation for her having beaten up Ms. Marbury, and that Ms. Wilson–Bey executed this premeditated plan." *Wilson–Bey I,* 871 A.2d at 1157–58. Indeed, Teresa Brown testified that Ms. Marbury had openly stated her intention to kill "that bitch," referring to the decedent, and if Ms. Brown's testimony is credited, and if the record is viewed, as it must be for sufficiency purposes, in the light most favorable to the prosecution, then the elements of deliberation, premeditation, and specific intent to kill have been readily satisfied.

■ But "[m]ere sufficiency of the evidence does not dictate a finding of harmless error." *Bell v. United States,* 801 A.2d 117, 129 (D.C.2002). Even under the less rigorous standard of *Kotteakos,* "analysis under the harmless error doctrine should not be limited to superficial

inquiry as to whether the same verdict would have been possible absent the tainted evidence."[46] [*Raymond*] *Brooks v. United States,* 367 A.2d 1297, 1309 (D.C. 1976); *see also Clark v. United States,* 593 A.2d 186, 192 (D.C.1991). To conclude that an error is harmless, we must find it *"highly probable* that [that] error did not contribute to the verdict." *United States v. Tussa,* 816 F.2d 58, 67 (2d Cir.1987) (emphasis added) (quoting *United States v. Corey,* 566 F.2d 429, 432 (2d Cir.1977)); *Clark,* 593 A.2d at 192; *see also In re Ty.B.,* 878 A.2d 1255, 1267 (D.C.2005). In the present case, as we have seen, the issue is whether the error was harmless beyond a reasonable doubt, and the foregoing authorities apply *a fortiori* in Ms. Marbury's favor.

■ In our view, the government has not satisfied the *Chapman* standard vis-a-vis Ms. Marbury. Ms. Marbury argues that her inebriation warrants reversal. Voluntary intoxication "may nega[te] the ability of the defendant to form the specific intent to kill, or the deliberation and premeditation necessary to constitute first-degree murder in which event there is a reduction to second-degree murder." *Harris v. United States,* 375 A.2d 505, 508 (D.C.1977) (citing *Bishop v. United States,* 71 U.S. App.D.C. 132, 136, 107 F.2d 297, 301 (1939)). The evidence required to support a voluntary intoxication defense, however, is quite exacting—the record must demonstrate "such a degree of complete drunkenness that a person is incapable of forming the necessary intent essential to the commission of the crime charged." *Smith v. United States,* 309 A.2d 58, 59

---

**45.** The government did not argue to the division that any error was harmless, and cited neither *Kotteakos* nor *Chapman* in its brief. Arguably, the government therefore waived the point. *See Randolph v. United States,* 882 A.2d 210, 222–23 (D.C.2005), and authorities there cited. Because the government did

make the argument in its brief to the en banc court, and because both appellants had ample opportunity to respond, we are prepared, in the exercise of our discretion, to entertain the government's argument on its merits.

**46.** Or, in this case, the tainted instructions.

(D.C.1973); *see also Powell v. United States,* 455 A.2d 405, 412 (D.C.1983).[47] Although there was extensive testimony regarding Ms. Marbury's drinking and state of intoxication at the time of her fight with Ms. Blackwell and also when she first determined to seek revenge, the effects of the intoxication may well have dissipated by the time of the murder hours later. But even if we assume that Ms. Marbury had the capacity to form the requisite specific intent and to deliberate upon and premeditate a murder, the "cooperating witnesses" testified that appellants and their friends went to Ms. Blackwell's house to find out why Ms. Marbury was beaten up and to fight the decedent and her friends. None testified that there was any plan to kill Ms. Blackwell, and one of the women explicitly denied that the group harbored an intent to kill. Teresa Brown's testimony that Ms. Marbury had declared her intent to kill Ms. Blackwell was, as we have observed, see note 4, *supra,* subject to substantial impeachment. Thus, taking the evidence as a whole, an impartial juror might readily have a reasonable doubt whether Ms. Marbury in fact formed an intent to kill Ms. Blackwell, as distinguished from an intent to join with others in beating up Ms. Blackwell and her friends. Under the trial court's "natural and probable consequences" instruction, however, a juror who believed that Ms. Marbury's intent was merely to join in an *assault* on Ms. Blackwell could nevertheless reasonably find Ms. Marbury guilty of aiding and abetting armed *premeditated* murder. The error was therefore potentially decisive, and we cannot say, with respect to Ms. Marbury, that it was harmless beyond a reasonable doubt.

### (2) *Ms. Wilson–Bey.*

 Some time after taking a beating from Tomika Blackwell, Ms. Marbury arrived with four of her friends at Ms. Wilson–Bey's home. Ms. Marbury related to her older sister that Ms. Blackwell and her friends had "jumped" her, and Ms. Wilson–Bey looked at Ms. Marbury's injuries, which, as we have noted, included a bloody nose, a busted lip, an injured eye, and a knot on her head. Ms. Wilson–Bey then interrupted Ms. Marbury's narrative, went into the kitchen, grabbed a knife, and told the other women that "I am going to kill that bitch." She subsequently announced that she was going to "fuck one of them up," obviously meaning Ms. Blackwell.

When the group arrived at Ms. Blackwell's apartment house, Ms. Wilson–Bey was one of the three women who rushed up to the decedent's unit, and she immediately spoke for the group, telling Mr. Rucker that she wanted to see Tomika. When an apparently unintimidated Ms. Blackwell came to the door, announced her presence, and advanced towards Ms. Wilson–Bey, the latter stabbed her near her eye. The two women struggled, and different witnesses estimated that Ms. Wilson–Bey swung her knife at the decedent "at least three times" and "four or five times," causing the victim's blood to flow "everywhere." Subsequently, the group left Ms. Blackwell in a gravely wounded condition and proceeded to Teresa Brown's house, where, according to the testimony, Ms. Wilson–Bey yelled at her: "Come outside, bitch, I'm going to kill you." Finally, Ms. Wilson–Bey made a telephone call to her brother and, in order to ensure that no one would betray her by reporting her deeds to the authorities, she gave him the

---

47. "[T]here must be evidence of the type and quantity of alcohol consumed, the length of time during which it was consumed, and the specific manner in which the consumption made the defendant incapable of acting with specific intent." *Washington v. United States,* 689 A.2d 568, 574 (D.C.1997).

names of all of the participants in the night's violence.

With respect to the killing itself, Ms. Wilson–Bey was obviously the leader of the group that went to Ms. Blackwell's home to avenge the beating of Ms. Marbury. She was charged with premeditated murder as a principal, on the theory that she was the killer, while the government took the position that Ms. Marbury was an aider or abettor. Some doubt was cast by the medical evidence, however, on the government's theory that it was Ms. Wilson–Bey who inflicted the fatal wound. The medical examiner, testifying for the prosecution, found numerous stab wounds on the decedent's body. One of the wounds, five to six inches deep, and one half-inch long, transected Ms. Blackwell's jugular vein, penetrated her lung, and resulted in her death. A forensic pathologist called by Ms. Wilson–Bey testified that Ms. Blackwell's wounds were caused by at least two different knives, that the fatal wound was inflicted with a knife that had a narrow blade, and that a large knife, such as the one said to have been wielded by Ms. Wilson–Bey, would not have produced that wound. Ms. Wilson–Bey's attorney argues that his client therefore could not have killed Ms. Blackwell, and that if she participated in the killing at all, it was only as an aider and abettor. Therefore, counsel maintains, Ms. Wilson–Bey was prejudiced by the erroneous instruction regarding the elements of accomplice liability. Moreover, although the government principally argued that Ms. Wilson–Bey was the principal in the killing, the prosecutor also told the jury that both appellants could be found guilty on an aiding and abetting theory.

The evidence that Ms. Wilson–Bey played a leading role in the murder of Ms. Blackwell was overwhelming. "Carrying the murder weapon to the scene of the crime [48] 'is highly probative of premeditation and deliberation ... as it permits the inference that appellant arrived on the scene already possessed of a calmly planned and calculated intent to kill.' " *Mills,* 599 A.2d at 782 (quoting *McAdoo v. United States,* 515 A.2d 412, 427 (D.C. 1986)). Whether the instructional error was harmless beyond a reasonable doubt boils down to whether an impartial juror could reasonably conclude that Ms. Wilson–Bey did not kill (or help to kill) the decedent with deliberation, premeditation, and the specific intent to cause her death.

The government discerns no difficulty in answering that question in the negative. It asserts, in a footnote to its en banc brief, that no reasonable juror could find in her favor:

> Because [Ms.] Wilson–Bey was tried as the principal and the evidence showed that she repeatedly plunged her knife into Ms. Blackwell after earlier declaring her desire to "kill," it is impossible to perceive how the aiding-and-abetting instruction could have harmed her. At any rate, as our recitation of the facts demonstrates, the overwhelming evidence established beyond a reasonable doubt that [Ms.] Wilson–Bey traveled to Atlantic Street with the intent to kill Ms. Blackwell and that she did so with premeditation and deliberation.

We think that the government's assessment of the record as to this appellant is consistent with, and indeed compelled by, common sense. Any impartial trier of fact who credited the prosecution's evidence [49] would, in our view, be bound to conclude that Ms. Wilson–Bey intended to kill the decedent, tried to kill her, and succeeded

---

48. Or, in this case, carrying a potential murder weapon with which the decedent was stabbed several times. Several women also carried weapons to the scene, but the evidence against Ms. Wilson–Bey—that she threatened to kill Ms. Blackwell, brought a butcher knife to the scene, and repeatedly stabbed the decedent—is more compelling than the evidence against any of Ms. Wilson–Bey's confederates.

49. The convictions of both appellants of, *inter alia,* aggravated assault while armed demon-

in doing so, either by personally causing her death or by abetting a knife-wielding confederate who actually inflicted the fatal wound if Ms. Wilson–Bey did not. To quote *Peoni*, Ms. Wilson–Bey, at the very least, intended that the decedent be killed, and she "participated in [the killing] as in something that [s]he wishe[d] to bring about, that [s]he [sought] by [her] action to make it succeed." 100 F.2d at 402. In sum, we conclude that as to Ms. Wilson–Bey, the instructional error was harmless beyond a reasonable doubt, and that revision of the instruction on aiding and abetting to conform to the standard that we have now adopted would not have affected the jury's verdict as to her.[50]

## IV.

### CONCLUSION

For the foregoing reasons, we remand the case to the trial court with directions to vacate both appellants' convictions of assault with a dangerous weapon. See note 3, *supra.* Ms. Wilson–Bey's remaining convictions are affirmed. Ms. Marbury's conviction of premeditated murder while armed is reversed, and the case is remanded for further proceedings consistent with this opinion;[51] Ms. Marbury's other convictions are affirmed. With respect to those contentions of the appellants which are not explicitly addressed in this opinion, the en banc court reaffirms and adopts the conclusions reached by the division in *Wilson–Bey I*, 871 A.2d at 1166 n. 20.

*So ordered.*

strate that the jury accepted the largely uncontradicted testimony of the government's witnesses regarding the manner in which the crime was committed.

50. If the jury reached the aiding and abetting theory as to Ms. Wilson–Bey, the natural and probable consequences instruction obviously permitted conviction upon less evidence than an instruction requiring proof of deliberation and premeditation would have done. We discern no reasonable doubt, however, that the outcome under a correct instruction would have been the same.

51. The government has not requested, in the alternative, that we enter judgment on the lesser included offense of second-degree mur-

der as to Ms. Marbury, and in the absence of briefing or argument on the issue, we do not decide whether such a course would be appropriate. *But see, e.g., Willis v. United States*, 692 A.2d 1380, 1382–83 (D.C.1997) (despite absence of language in appellate mandate "that the government could elect between retrial and judgment on a lesser included offense," trial court on remand properly entered such judgment where "the lesser included offense ... was not affected by the error causing reversal"). See also note 36, *supra*, discussing the evidence required to prove second-degree murder, and Part III F(1), at pp. 844–45, *supra*, addressing the appropriate disposition if a defendant is too intoxicated to be able to form the specific intent required for premeditated murder.